## NUDD ET AL. v. BURROWS, ASSIGNEE.

1. Where, in a suit by an assignee in bankruptcy to recover moneys paid a creditor within four months prior to the filing of the petition in bankruptcy, the evidence tended to prove that the payment was the result of a conspiracy between the bankrupt and the creditor to give the latter a fraudulent preference within the meaning of the Bankrupt Act, — *Held*, that the declarations

of the bankrupt at and prior to the time of such payment, although made in the absence and without the knowledge of the creditor, were, when offered by the assignee, admissible in evidence.

2. The assignee claimed that a partnership formerly existing between the bankrupt and other parties had been dissolved prior to a certain transaction; and that, consequently, that transaction was had with the bankrupt individually, and not with the firm. The defendants, insisting to the contrary, offered the declarations of such other parties touching the points in controversy. *Held*, that such declarations were not evidence.

3. The defendants having claimed that they appropriated the money and proceeds of the property in question, in the exercise of a factor's lien, to satisfy a prior indebtedness alleged to be due them by the bankrupt, — *Held*, that the attempt to set up such a lien, when the creditor knew that the debtor was on the eve of bankruptcy, and thus secure a preference over other creditors, was a fraud upon the Bankrupt Act.

4. The Practice Act of Illinois provides that the court shall instruct the jury only as to the law; and that the jury shall, on their retirement, take the written instructions of the court, and return them with their verdict. In this case, the court below, while it commented upon the evidence, but without withdrawing from the jury the determination of the facts, refused to allow the jury to take to their room the written instructions given them. *Held*, that the act of Congress of June 1, 1872, sect. 5 (17. Stat. 197), has no application to the case, and that there was no error in the action of the court below.

Error to the Circuit Court of the United States for the Northern District of Illinois.

This was an action brought by the defendant in error, as the assignee of one Norton Emmons, a bankrupt, against the plaintiffs in error, to recover the net proceeds of about eleven carloads of live-stock and dressed hogs shipped by the bankrupt to the plaintiffs in error, and one thousand dollars in money paid by him to them, which proceeds and money they had applied to the payment of his indebtedness to them, in fraud, as contended by the assignee, of the provisions of the act to establish a uniform system of bankruptcy throughout the United States, approved March 2, 1867. Judgment was rendered in favor of the assignee.

A bill of exceptions was allowed in the court below, which is in substance as follows: —

The plaintiff introduced evidence tending to show that Emmons had for a number of years been engaged in the stock business in Wisconsin, purchasing cattle, sheep, and hogs, and shipping them chiefly, but not always, to the defendants at Chicago, for sale upon commission; that about the first day of July, 1870, Emmons associated with him Richard B. Chan-

dler and James W. Chandler, and that said parties thenceforth, under the firm name of Emmons & Chandler, continued the business, also shipping chiefly to the defendants the stock which they bought; that about the thirteenth day of December, 1870, said firm was indebted to the defendants between $4,000 and $5,000; that Emmons was then insolvent; that it was then arranged between the defendants, said Emmons and said Richard B. and James W. Chandler, that said firm of Emmons & Chandler should dissolve; that James W. Chandler had previously gone out; that Emmons should continue the business until the first of the following January, and should at the close of the year buy a large amount of stock upon credit, which should be shipped to and sold by the defendants, and the proceeds applied to pay his indebtedness to them; that the firm of Emmons & Chandler did dissolve about the thirteenth day of December; that Emmons did in the first four days of the following January, in his own name and on his own account, ship to the defendants nine car-loads of cattle, sheep, and hogs, which were sold by them, and the proceeds held to pay the said indebtedness; that upon the sixth day of January, 1871, Emmons paid to the defendants $1,000 in money; that the net proceeds of said last shipment, so held by them, was $7,553.27; that a large part of the stock which went into the last shipment was paid for by drafts drawn by Emmons on the defendants, which were not accepted or paid by them; that the amount of drafts so drawn and unpaid was about $4,000; that a petition in bankruptcy was filed against Emmons in the District Court of the United States for the Eastern District of Wisconsin, on the eighteenth day of February, A.D. 1871, on which petition he was duly adjudicated a bankrupt; that the defendants, at the time of making the aforesaid arrangement, — to wit, on or about the thirteenth day of December, 1870, — had reasonable cause to believe said Emmons was insolvent.

As tending to show some of said matters, the plaintiff introduced in evidence a document as follows: —

"CHICAGO, Dec. 13, 1870.

" *To whom it may concern:* —

"This certifies that whereas Mr. R. B. Chandler has been a joint partner with Norton Emmons from the first day of July, 1870, to date, we release him from all further obligations that may be trans-

acted between us and Norton Emmons, and look to Norton Emmons only for balance of present account and all business that may hereafter be transacted with him.

"The above release of R. B. Chandler is made by the consent of all parties.   "I. P. NUDD & Co."

Also the ledger of the defendants, showing the account of Emmons and of the firm of Emmons & Chandler with the defendants.

The last item upon the account of Emmons & Chandler is as follows:—

"1870, Dec. 13.   By balance due Nudd, $1,617.43."

Under which is written the following:—

"The above balance we transfer to the individual account of Norton Emmons, by request of both parties."

Immediately after and upon the same ledger page is the following, showing all the entries made subsequent to said Dec. 13, 1870:—

| DR. | | | NORTON EMMONS. | | CR. |
|---|---|---|---|---|---|
| 1870. | | | | 1870. | |
| Dec. 13 | To balance due Nudd, and transferred from the ac. of Emmons & Chandler . . . | $1,617 43 | Dec. 24 | By net proceeds . . | $1,140 07 |
| „ 13 | To paid draft . . . | 1,500 00 | „ 24 | „ „ dressed hogs . | 4,767 51 |
| „ 14 | „ „ „ . . . | 1,500 00 | „ 3 | „ „ proceeds . . | 107 04 |
| „ 15 | „ „ „ . . . | 1,500 00 | „ 28 | „ „ „ . . | 651 88 |
| „ 16 | „ „ E. Peterson . | 750 00 | „ 28 | „ „ „ . . | 766 31 |
| „ 21 | „ „ draft . . . | 187 00 | „ 28 | „ „ „ . . | 1,929 48 |
| „ 22 | „ „ „ . . . | 1,500 00 | „ 29 | „ „ „ . . | 765 84 |
| „ 23 | „ „ „ . . . | 3,500 00 | „ 20 | E. & C., dressed hogs | 1,396 64 |
| „ 23 | „ „ „ . . . | 200 00 | „ 29 | E. & C., dressed hogs | 863 58 |
| | | | | 1871. | |
| „ 23 | „ „ S. W. Montague | 500 00 | Jan. 7 | „ „ „ | 1,444 15 |
| „ 24 | „ „ draft . . . | 55 72 | „ 6 | „ „ cash rec'd . | 1,000 00 |
| „ 24 | „ „ „ | 1,000 00 | „ 10 | „ net proceeds . | 4,002 03 |
| „ 24 | „ „ „ | 400 00 | „ 10 | „ „ dr. h. . . | 1,174 37 |
| „ 16 | „ „ Chandler . . | 40 00 | „ 10 | „ „ dr. h. . . | 1,268 16 |
| „ 16 | „ „ Peterson . . | 35 00 | | | |
| „ 16 | „ „ Johnson . . | 5 00 | | | |
| „ 3 | „ „ protest fees . | 10 20 | | | |
| „ 27 | „ „ draft . . . | 300 00 | | | |
| „ 28 | „ „ „ . . . | 600 00 | | | |
| „ 31 | „ „ „ . . . | 4,000 00 | | | |
| „ 31 | „ „ „ . . . | 1,000 00 | | | |
| „ 31 | „ „ „ . . . | 750 00 | | | |
| Jan. 11 | „ acceptance . . . | 334 84 | | | |

To certain questions put to the witnesses, calling for the declarations and statements of Emmons at and before the

consignment was made, the defendants objected, because said declarations, not being made in the presence of either of the defendants, nor brought to the knowledge of either, could not be used to prejudice them; which objections being over-ruled by the court, and the answers admitted, the defendants then and there excepted.

The defendants introduced evidence tending to show that they acted as the factors of said Emmons prior to the time of his partnership with Richard B. and James W. Chandler, and for said firm of Emmons & Chandler after that time and until the closing of the account, Jan. 10, 1871; that during all this time it had been the usual course of business and the regular practice of the defendants to advance money to these parties to buy stock, relying upon the consignments to be made to them to cover such advances; that the defendants continued to make such advances after the thirteenth day of December, 1870, in the same manner as before, receiving consignments, and selling the same to cover their previous advances; that the indebtedness to the defendants at the time of the last shipments of stock was for such advances; that these advances were made by payment of drafts upon the defendants; that such drafts were drawn in the name of Emmons, as well after as before the formation of the copartnership of Emmons & Chandler; that the bank business of the firm of Emmons & Chandler was done at the First National Bank of Madison, Wis., in the name of Emmons alone, as well after as before the formation of said copartnership, and that the drafts upon the defendants usually came through said bank; that their ledger, introduced in evidence, correctly shows the sums advanced by them upon drafts since the 13th December, 1870; that such advances were made in good faith, and in the usual and ordinary course of business, and relying upon consignments to be made to the defendants to cover such advances; that there was no such arrangement for the payment of the indebtedness to the defendants made about the 13th of December, 1870, or at any other time, between the defendants, or either of them, and said Emmons, Richard B. Chandler, and James W. Chandler, or either of them, as claimed by the plaintiff; that said firm of Emmons & Chandler did not dissolve

upon or about the 13th December, 1870; that said James W. Chandler did not go out before that time, but that certainly James W. Chandler, and probably Richard B. Chandler, continued to be interested in business with said Emmons subsequently to that time, and continued so interested till the time of the closing of the account with defendants, Jan. 10, 1871; · that the transfer of the account on the book of the defendants from the name of Emmons & Chandler to that of Norton Emmons was made at the request of said Emmons and the Chandlers; that the reason given to defendants for such request was, that all drafts were drawn in the name of Emmons alone; their bank business of Madison, Wis., was done in his name, and they desired their account on the defendants' books to correspond; that defendants had no idea that the firm of Emmons & Chandler was dissolved, or that their dealings with said firm were thereby brought to a close, or that, by making such a change, they released either of the Chandlers, but regarded the transfer simply as a change in the manner of keeping their books; that the receipt or release to Richard B. Chandler was not given to him until about the middle of January, 1871, after the account with the defendants was closed; that it was antedated at the request of said Richard B. Chandler; that it was given by the defendants unhesitatingly, and with but little inquiry into the reasons of Chandler for wishing the same antedated, because, at the time it was actually given, their account was paid in full; that business was conducted in the same manner subsequently to the 13th December, 1870, as before that time, and the defendants supposed they were doing business with the firm of Emmons & Chandler up to the time the account was closed, and, until such time, knew of nothing from which they could infer the dissolution of said firm; that there was nothing unusual about the size or quality of the last shipments, and the same were not, nor was any part of them, sold by the defendants under any arrangement with said Emmons and the Chandlers, or either of them, that the proceeds should be used to close up the account with the defendants; that shipments continued to be made after Dec. 13, 1870, and up to the time of the closing of the account, with one or two exceptions, in the name of Em-

mons & Chandler, and not in the name and on account of Emmons alone; that. Richard B. Chandler was worth $15,000 or $20,000; that James W. Chandler, though of small means, was solvent; that if the copartnership of Emmons & Chandler continued subsequently to the 13th December, 1870, and up to the time of closing the account, said firm was not insolvent; that the defendants did not know at any time prior to the closing of said account that said Emmons was insolvent, and that they had no reasonable cause to believe that he was. A witness for the defendants testified that the partnership between Emmons, Richard B. Chandler, and James W. Chandler, continued until some time in January of 1871. To a question in this connection as to the declarations of Richard B. Chandler after the 13th of December, respecting his being interested in the firm carried on in the name of Norton Emmons, the plaintiff objected; and, the objection being sustained by the court, the defendants duly excepted.

A witness for the defendants having. testified that James W. Chandler frequently came to Chicago after Dec. 13, 1870, in charge of the consignments of stock, the defendants asked what if any thing was said respecting the sale or prices at which stock should be sold.

To which, and to the admission of any declarations of said Chandler, plaintiff objected. The court sustained the objection, and refused to admit the evidence; and the defendants excepted.

Before the charge to the jury, and in apt time, defendants' counsel requested that the court would in all respects in its charge be governed by and follow the practice of courts of record of the State of Illinois and the laws of the State applying to such matters; but the court refused so to do, and defendants' counsel then and there excepted.

Defendants' counsel then prepared and handed to the court the following instructions in writing, requesting that they be given to the jury, with permission to take them to their room : —

"*First*, If the jury believe, from the evidence, that either R. B. or J. W. Chandler was a partner with Norton Emmons subsequent to the 13th of December, 1870, and remained so until the settle-

ment of the account with the defendants, and, as such partner or partners, was or were interested in the dealings with the defendants subsequent to that date, they are instructed, that, in such case, the plaintiff cannot maintain this suit.

"*Second*, If the jury believe from the evidence that the defendants advanced money to Norton Emmons to buy stock to be consigned to them, relying upon those consignments for the repayment of those advances, they are instructed, that, in such a case, the defendants would have a lien upon such consignments for such advances as soon as the same came to their possession, even if the defendants knew at the time of making such advances that said Emmons was insolvent."

The court gave the first instruction, but added to and commented upon it as follows: —

"I have charged you, as requested by the defendants' counsel, that if this debt on the part of the defendants was against Emmons and the Chandlers, or either of them, the plaintiff cannot recover. . . . On the main question, which covers most of the property, I shall not occupy much time. The evidence to establish it rests in writing, under the defendants' own signature. By the defendants' books, it appears that the partnership account of Emmons & Co. was settled, and the balance transferred upon their books to the individual account of Norton Emmons on the 13th of December; that after that it was kept with him alone, and the defendants did not pay any amount to the Chandlers without an order from Emmons; and, in addition to this, they signed a receipt, release, or declaration, as follows: —

"'CHICAGO, Dec. 13, 1870.

"' *To whom it may concern:* —

"' This certifies that whereas Mr. R. B. Chandler has been a joint partner with Norton Emmons from the first day of July, 1870, to date, we release him from any further obligation that may be transacted between us and Norton Emmons, and look to Norton Emmons only for balance of present account and all business that may hereafter be transacted with him.

"' The above release of R. B. Chandler is made by the consent of all parties.'

"That would seem to settle all controversy upon this question. That matter having been so carefully reduced to writing by the defendants at the time, or soon after, while the matter was fresh in their memory, it would seem most remarkable to allow them now to

swear it away.. The book and the release show that they agreed to deal thereafter with Emmons, and released Chandler altogether, and did so on their books. So far as Chandler and Emmons are concerned, it was an individual matter with them; but as the assignee represents Emmons's right, and is entitled to the benefits under his contract, as to him, it would be very remarkable that they could, in view of these entries and the statement or release, be allowed to set up that he was still a party in interest as to that. Written testimony is much stronger than parol. It is like a disputed case in regard to the boundaries of real estate in which a government boundary is discovered. It generally disposes of the dispute, and outweighs, ordinarily, any amount of verbal testimony depending upon the recollection of witnesses, particularly interested parties and witnesses.

"Nudd says he drew the release; but he says he did not draw it until in January, after that date. The time when it was drawn is quite immaterial. It declares the fact that they did business with Emmons alone; and, if that is so, that disposes of the defence on that ground. There is some testimony that the receipt was given to Chandler on the 13th. Emmons says he heard him say that he had a receipt when he returned home.

"If you are satisfied that the receipt was made at the time it bears date, or afterwards, with a view to furnish evidence to release Chandler from the 13th, and as stating the true condition of their affairs, I hardly think that you will be justified in finding that the transaction between the parties was not as stated in the books of the defendants and this release or declaration; and it would be unsafe to reject written evidence of that character upon the evidence of interested parties."

To all of which modifications and comments, and to that portion of the charge, save as requested by them, the defendants then and there excepted.

The court gave the second instruction asked by the defendants, but modified and commented upon it as follows:—

"The books of account of defendants read in evidence, together with the testimony, tend to show that the defendants had been advancing the bankrupt money from time to time after the thirteenth day of December, 1870; and that on the thirty-first day of December, 1870, the time of the last item of account, the bankrupt was owing to them the sum of $8,553.87. This money it is claimed was advanced by defendants, who were stock-brokers and general

commission-men in this city, engaged in the business of receiving stock, cattle, and hogs, making advances thereon, and selling for the benefit of shippers. They state that their ordinary mode of doing business was not to pay drafts drawn by their country customers or consignors until after the receipt of stock, but in this case they permitted the bankrupt to draw and obtain the money to use in buying stock. When that stock was received and sold, they credited his account with the proceeds; and such appears to have been the way they dealt with the bankrupt, so that he had overdrawn his shipments on the first day of January in the sum of $8,553.87, above stated. This being the mode of business pursued, as I understand to be stated, I think it would constitute the relation of debtor and creditor between the bankrupt and the defendants; that he, in law and fact, was owing on the first of January to the amount above stated, which was unsecured at that time; that the advances did not create a lien on such stock purchased with the money advanced or loaned for that purpose until the bankrupt had actually shipped them to the defendant.

"As I have charged you, at the request of the defendants' counsel, that the lien of the defendants did not attach until the actual receipt of the stock by the defendants, such being the law, the subsequent receipt of stock and appropriation of the avails to the payment of the debts due them would be void, as a preferential payment, provided the other facts hereinafter mentioned are found to have existed; by which I mean to be understood, that, if the transactions between the parties were as I have before stated them, they would constitute the relation of debtor and creditor, and bring their debt under the provisions of the Bankrupt Act the same as any other debt."

To all of which defendants' counsel excepted.

The court having charged the jury upon the facts, notwithstanding the request that it would follow and be governed by the laws of the State of Illinois and the practice of her courts of record, defendants' counsel excepted thereto, as well as to its refusal to permit the jury to take to their room the written instructions given by the court, or the account-book, freight-bills, and other papers introduced in evidence, other than the depositions.

*Mr. W. H. Swift* and *Mr. W. C. Grant,* for plaintiffs in error, filed printed briefs, from which the following points are taken: —

1. The declarations of J. W. Chandler should have been admitted. Phil. on Ev., vol. i. 498; *Cady* v. *Shepherd*, 11 Pick. 407; *Pool* v. *Bridges*, 4 id. 378; *Richardson* v. *Cato*, 10 Humph. 138; 1 Greenl. Ev., sect. 181.

2. The court erred in not following the practice of the courts of Illinois, and the laws of Illinois applying to such matters. Rev. Stat. U. S., sect. 914.

"The court, in charging the jury, shall only instruct as to the law of the case." 2 Gross's Stat. Ill., ch. 83, sect. 139.

"Instructions shall be taken by the jury in their retirement, and returned by them with their verdict." Id., sect. 142.

3. The court erred in the instruction given upon the question of copartnership.

This question of the continuance of the partnership is material. If a preference is given by a firm of which only one member goes into bankruptcy, such preference cannot be avoided by the assignee of the bankrupt partner. *Forsaith* v. *Merritt*, 3 N. B. 48; *In re Shepherd*, id. 172.

4. The court erred in its instruction upon the question of a factor's lien.

The bankrupt estate is in no worse condition, if the defendants are allowed to retain the proceeds of the consignments, than it would have been if the defendants had never made the advances in reliance upon these consignments. *Anderson* v. *Clark*, 2 Bing. 20; *Harle* v. *Smith*, 1 B. & P. 563; 3 Pars. on Contr. 260; *Foxcroft* v. *Devonshire*, 2 Burr. 931.

*Messrs. H. W. Tenney, H. M. Lewis,* and *J. C. McKenney, contra.*

1. As to the declarations of the bankrupt.

When a conspiracy is formed to do an illegal act, or to commit a fraud, the acts or declarations of any of the conspirators may be given in evidence. 1 Greenl., sect. 111; *American Fur Co.* v. *United States*, 2 Pet. 358.

2. The declarations of R. B. Chandler were properly excluded. He could have been called as a witness.

3. As to the objection that the court did not follow the practice of the courts of Illinois.

The court did not instruct the jury as to the facts, but only as to the law.

4. As to the lien claimed by the defendants below as factors or brokers. The indebtedness of the bankrupt to the defendants below, Jan. 1, 1871, stood upon the same footing as any other unsecured creditor. *Arnold* v. *Maynard*, 2 Story, C. C. 349; *Wager et al.* v. *Hall*, 16 Wall. 584; Story on Ag., sect. 377; Russel on Factors, 207 (Law Lib., vol. xlvi.).

The lien of a factor does not attach when the possession comes to him wrongfully or by fraud. 2 Kent, Com. 638; *Larupriere* v. *Pasley*, 2 Term R. 485; Story on Ag., sects. 360, 361.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The first of the assignments of error presents the question, whether the court erred in admitting in evidence the declarations of the bankrupt.

The suit was brought by the assignee to recover against Nudd and Noe for money and property which they had received from Emmons. They had applied the money and the proceeds of the property in payment of a debt which Emmons owed them. The property was live-stock, consisting of cattle, sheep, and hogs. The net proceeds were $7,553.27. The money was $1,000. The aggregate amount in controversy was $8,553.27. The assignee claimed that the stock was bought largely upon credit; that Emmons was at the time hopelessly insolvent; that Nudd and Noe knew it; and that the transaction was the fruit of a conspiracy between the parties, having for its object the giving to Nudd and Noe by Emmons a fraudulent preference over his other creditors.

Nudd and Noe received the property and money in January, 1871. The petition in bankruptcy against Emmons was filed in the following month of February. The action is founded on the thirty-fifth and thirty-ninth sections of the Bankrupt Act. The transaction was within four months before the filing of the petition. Upon the trial, the plaintiff proposed to prove what Emmons had said touching the purchase of the stock and the payment of the money to the defendants.

To each and all of the questions asked with this view the counsel for the defendants objected, " on the ground that they

called for the declarations of Emmons not made in the presence of either of the defendants, or brought to their knowledge."

Was this ground of objection well taken?

The counsel for the defendant in error insists that they were competent, as the declarations of a co-conspirator.

In general, the rules of evidence are the same in civil and criminal cases. *United States* v. *Gooding*, 12 Wheat. 469.

" Where two or more persons are associated for the same illegal purpose, any act or declaration of one of the parties in reference to the common object, and forming a part of the *res gestæ*, may be given in evidence." *American Fur Company* v. *United States*, 2 Pet. 365.

The bill of exceptions does not purport to give all the evidence. What proof had been given of the alleged concert and conspiracy on the part of the defendants when the declarations of Emmons were offered to be proved does not appear.

It is to be presumed it was sufficient to lay the proper foundation as to them for the introduction of the evidence. The declarations were competent to prove the whole case as against Emmons. 1 Taylor's Ev. 486.

Whether the declarations were made in the presence or brought to the knowledge of either of the defendants is immaterial. The objection as taken was confined to this point; and this is the only aspect in which it is necessary to consider it. If it were intended to rest it upon any other ground, it should have been so presented; and the court advised accordingly.

In the early part of December, 1870, Emmons and James W. and Richard Chandler were partners, under the name of Emmons & Chandler. The plaintiff claimed that the partnership was dissolved on the 13th of that month. The defendants insisted that it continued down to the close of the business in question, and that the transaction was not with Emmons alone, but with the firm of Emmons & Chandler.

They offered in evidence the declarations of the Chandlers touching the points in controversy. The court excluded the testimony, and the defendants excepted.

This ruling was correct. The declarations of a party may be evidence against him; but, except under circumstances which had no existence in this case, they cannot be received in his

favor.  The Chandlers might have been called as witnesses. Their declarations were merely hearsay, and, as regards this case, were *res inter alios acta.*

It appears by the bill of exceptions, that, in charging the jury,. the judge commented upon the evidence.

Questions of law are to be determined by the court; questions of fact, by the jury.  The authority of the jury as to the latter is as absolute as the authority of the court with respect to the former.

No question of fact must be withdrawn from the determination of those whose function it is to decide such issues.

The line which separates the two. provinces must not be overlooked by the court.  Care must be taken that the jury is not misled into the belief that they are alike bound by the views expressed upon the evidence and the instructions given as to the law.  They must distinctly understand that what is said as to the facts is only advisory, and in no wise intended to fetter the exercise finally of their own independent judgment. Within these limitations, it is the right and duty of the court to aid them by recalling the testimony to their recollection, by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts and their combined effect, stripped of every consideration which might otherwise mislead or confuse them.  How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury-trials.  Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid.  In such cases, chance, mistake, or caprice, may determine the result.

We do not think the remarks and suggestions of the learned judge in this case exceeded the proper license.

They did not go beyond the verge of what has been often sanctioned by this and other courts.  *Games et al.* v. *Stiles,* 14 Pet. 337 ; *United States* v. *Fourteen Packages,* Gilp. 254; 1 Taylor's Ev. 35.

The modifications of the two instructions asked for by the defendants were, we think, correct in point of law. Only the second one calls for any remarks.

There was proof tending to show that on the 13th of December, 1870, the defendants adjusted their account with Emmons & Chandler, and, by the agreement of all the parties, transferred the amount due to themselves to the separate account of Emmons, and gave the Chandlers a release. The balance found due, and so transferred, was the same with the amount in controversy, as before stated. The business of the defendants was the selling of live-stock upon commission. The balance accrued in the course of their previous business in this way with the firm of Emmons & Chandler. They claimed a factor's lien upon the money and proceeds of the property in question for the satisfaction of this demand.

The court charged, that, as the lien could not attach until the money and proceeds were received by the defendants, if the previous transactions created the relation of debtor and creditors between them and Emmons, and they could have sued Emmons for the amount, "this would bring the debt under the Bankrupt Act the same as any other debt."

This must necessarily be so. The lien attempted to be set up was repelled by the circumstances referred to. Such a claim occupies no better ground than would a mortgage, pledge, or power to confess judgment, given at the same time and for the same purpose; otherwise every factor might be thus secured when his debtor was in the article of bankruptcy, and this class of creditors would have a monopoly of the preferences so given. Such preference, to whomsoever given, is forbidden by the Bankrupt Law, and is a fraud upon it. Fraud destroys the validity of every thing into which it enters. It affects fatally even the most solemn judgments and decrees. Bankrupt Act, sect. 35; 1 Story's Eq., sect. 252; Freeman on Judgments, sect. 486.

Whenever fraud is perpetrated by one party to the injury of another, the offender is liable. *Paisley* v. *Freeman*, 3 T. R. 51; *Benton* v. *Pratt*, 2 Wend. 385. Here the jury have found the facts charged by the assignee. This is conclusive against the defendants with respect to any claim upon the fund.

The last assignment relates to alleged errors of the court in

matters of practice. Before the judge began his charge to the jury, the counsel for the defendants requested him, in giving it, to conform in all things to the practice of the courts of record and the law of the State. This he refused to do. He also refused to allow the jury to take with them to their room the written instructions he had given them, and likewise the account-book, bills of lading, and additional papers, which had been introduced in evidence, other than the depositions. To each of these refusals the defendants excepted.

The Practice Act of Illinois provides that the court, in charging the jury, shall instruct them only as to the law of the case; that no instruction shall be given, unless reduced to writing; that instructions asked shall not be modified by the court, except in writing; that the instructions shall be taken by the jury in their retirement, and returned with the verdict; and that papers read in evidence, other than depositions, may be carried from the bar by the jury. 1 Gross's Stat. 289.

It is declared by the act of Congress of June 1, 1872 (17 Stat. 197, sect. 5), " that the practice, pleadings, and forms and modes of proceeding, in civil causes, other than equity and admiralty causes, in the circuit and district courts, shall conform as near as may be " to the same things " existing at the time in the courts of record of the State within which such circuit and district courts are held."

The purpose of the provision is apparent upon its face. No analysis is necessary to reach it. It was to bring about uniformity in the law of procedure in the Federal and State courts of the same locality. It had its origin in the code-enactments of many of the States. While in the Federal tribunals the common-law pleadings, forms, and practice were adhered to, in the State courts of the same district the simpler forms of the local code prevailed. This involved the necessity on the part of the bar of studying two distinct systems of remedial law, and of practising according to the wholly dissimilar requirements of both. The inconvenience of such a state of things is obvious. The evil was a serious one. It was the aim of the provision in question to remove it. This was done by bringing about the conformity in the courts of the United States which it prescribes. The remedy was complete. The personal ad-

ministration by the judge of his duties while sitting upon the bench was not complained of. No one objected, or sought a remedy in that direction.

We see nothing in the act to warrant the conclusion that it was intended to have such an application.

If the proposition of the counsel for the plaintiff in error be corre .t, the powers of the judge, as defined by the common law, were largely trenched upon.

A statute claimed to work this effect must be strictly construed. But no severity of construction is necessary to harmonize the language employed with the view we have expressed. The identity required is to be in "the practice, pleadings, and forms and modes of proceeding." The personal conduct and administration of the judge in the discharge of his separate functions is, in our judgment, neither *practice, pleading,* nor *a form* nor *mode of proceeding* within the meaning of those terms as found in the context. The subject of these exceptions is, therefore, not within the act as we understand it.

There are certain powers inherent in the judicial office. How far the legislative department of the government can impair them, or dictate the manner of their exercise, are interesting questions; but it is unnecessary in this case to consider them. *Houston* v. *Williams*, 13 Cal. 24.        *Judgment affirmed.*