RINGOLD v. CROCKER. See Case No. 11,843.

## Case No. 11,851.

RINKER v. MANHATTAN LIFE INS. CO.

[1 Tex. Law J. 337.]

District Court, E. D. Texas. June 18, 1878.

LIFE INSURANCE—SUICIDE—QUESTIONS FOR JURY.

Action [by Mary Rinker against the Manhattan Life Insurance Company] to recover money upon policy of insurance.

MORRILL, District Judge (charging jury). On the morning of June 18, 1877, Selim Rinker was found in his office in Galveston, lying on a lounge, his left hand lying on his stomach, and his right hand resting on the floor of the room, and about eight or ten

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

inches from his right hand was a pistol of
two barrels, one of which was empty. His
head was punctured with something that
passed through his brain, entering at the
temple on the right side, and stopped at the
left side by the skull, which showed an in-
ternal pressure upon it. He was divested of
his hat and coat, which was suspended in
the room, and from the wound blood was
running down on his right shoulder, and
thence on his right arm to the floor. He
gasped for a very few seconds and life was
extinguished. He had a set of false teeth,
which were lying upon his shirt, near his
right shoulder.

The issues presented by the pleadings in
this case present one question for your con-
sideration, and for you to answer by your
verdict, which is, did Mr. Rinker shoot him-
self?. That Mr. Rinker died from this wound,
inflicted by some sort of firearms, that he
was shot in the recumbent position in which
he was found, and that the person that did
the shooting, if this shooting was not done
by Mr. Rinker, must have been in the room
where he was at the time of pulling the fatal
trigger, there can be no doubt. The defend-
ant insists that Mr. Rinker did the shooting,
and to sustain this position has introduced
testimony the object of which was to show
that he was in such a mental condition,
brought about by his actions, as would cause
suicide. You will consider. this testimony,
and if you believe that he acted in such a
way as would go to show that he was not in
his right mind, or, if in his right mind, that
a reflection upon the consequences of his
acts would naturally cause him to despair,
and prefer to die than live; and if it has
been further proved to your satisfaction that
he had the means at his command to bring
about self-destruction, you can decide wheth-
er it was possible that Mr. Rinker committed
suicide. The plaintiff had introduced testi-
mony for the purpose of showing that a
certain named party had acquired great in-
fluence over him, and had been the cause at
least in part of Mr. Rinker's fatal descent to
the abyss in which he was by his act of
polygamy, and that it was this person who
added the crime of murder to others not
odious. Assuming that it is not possible
that Mr. Rinker was killed accidentally, you
must further assume that whoever killed Mr.
Rinker had both the intention and ability to
do so without being discovered. If you are
satisfied that the party referred to as Mr.
Rinker's evil genius, had both the inclina-
tion and ability to take his life at the time
and place and in the manner that it was tak-
en, and not being detected in doing so, you
can then decide whether it was possible that
he did do it. If you decide that the killing of
Mr. Rinker by either Mr. Rinker himself or
the other named party is within the bounds
of possibility, the next inquiry would relate
to the greater probability as to which of the
two parties committed the deed. If it shall

appear to your satisfaction from the testi-
mony that it is more probable that Mr. Rink-
er killed himself, you will find for the de-
fendant; but if from the testimony it ap-
pears equally or more probable that Mr.
Rinker was killed by some other person, you
will find for the plaintiff.

So far, gentlemen, I have given you the law
of the case, by which you will be governed.
But as this case is somewhat of an unusual
character, and as the supreme court of the
United States has declared that it is the duty
of a judge, in order to assist them in form-
ing their verdict, "to recall the testimony to
their recollection, to direct their attention to
the most important facts by elucidating the
true points of the inquiry, and by showing
the bearing of its several parts and their
combined effect stripped of every considera-
tion which might otherwise mislead them,"
for the purpose of assisting you in your la-
bors, and not for influencing you in your
opinion, I will add a few words to the
charge. You are not trying any one for mur-
der or any other crime. When the death of
a suicide is announced in the papers, it is
generally followed by something announcing
the fact of his troubles and afflictions as a
cause, or that it takes the community by sur-
prise, as family relations and finances sug-
gest no probable cause. In fact, severe af-
flictions and suicide are regarded as cause
and effect. When everything around us is
dark, cloudy and tempestuous; when the
miser has all his money and effects stolen;
when the religious enthusiast conceives that
he or she has committed the unpardonable
sin; when the respectable man of society
finds that he has acted in such manner as
causes him to believe that he will be an
outcast; when the poor laborer perceives
nothing but starvation to himself, and those
more dear than himself,—he mentally or
vocally exclaims, in the language of the
first murderer, "My punishment is greater
than I can bear." More persons than we are
aware of have said to themselves, "To be or
not to be; that is the question."

If you believe the testimony in this case
is such as to cause Mr. Rinker to consider
and believe, taking into consideration the
kind of man he was and the crime he had
committed, that "it is better for me to die
than to live;" if you believe that there had
been men in similar circumstances who have
committed suicide, then you are authorized
to infer that he conceived sufficient cause to
take his own life; and if other circumstances
show that he was shot in the most fatal
place, and in a way and manner that he
could do it himself more fatally than any oth-
er one could or would do; if, in fact, you
find that Mr. Rinker had both the inclination
and ability to commit suicide,—then you are
authorized to say it is probable he did mur-
der himself. But there are different degrees
of probability. And while it may be prob-
able that he may have done so, we must

next look at another side of the case. If you believe that another person also had an inclination to kill Rinker, and had as good an opportunity so to do; if, for instance, Rinker and this other person were in the same room, and each had equal power, ability and inclination to do the killing, in that case, as the probabilities would be equal, we would have to look at other circumstances to ascertain which of the two did the deed. If Rinker had been shot in a part of his person that another would be more likely to shoot at than himself, either because it would present a larger mark, and he would therefore be less likely to miss his fatal aim, then the probabilities that the other and not Rinker committed the fatal deed would be greater. If, again, both of the parties were in the room at the time of shooting, and other facts show that the pistol when discharged was at a greater distance than could be if used by Rinker, then this fact would show that it is more probable that the other person did the shooting. But if there is no testimony going to show that any other person was present than Rinker when he was killed, and if surrounding circumstances do not repel the idea that suicide was committed, it is for you to decide whether you have sufficient testimony to say that the probabilities that Rinker killed himself are greater than are those that any other person did the deed.

NOTE. The authority referred to by his honor, Judge Morrill, is embraced in the following extract from the opinion of the supreme court of the United States in the case of Nudd v. Burrows, 91 U. S. 439, decided in 1875: "Questions of law are to be determined by the court; question of fact, by the jury. No question of fact must be withdrawn from the determination of those whose function it is to decide such issues. The line which separates the two provinces must not be overlooked by the court. Care must be taken that the jury are not misled into the belief that they are alike bound by the views expressed upon the evidence and the instruction given as to the law. They must distinctly understand that what is said as to the facts is only advisory, and in no wise intended to fetter the exercise finally of their own independent judgment. Within these limitations is the right and duty of the court to aid them by recalling the testimony to their recollection, by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by elucidating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts, and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is more importance resting upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid. In such cases, chance, mistake, or caprice may determine the result."