TEXAS & P. RY. CO. *v.* THOMPSON.

SAME v. DIETZ.

(Circuit Court of Appeals, Fifth Circuit. December 30, 1895.)

Nos. 399, 400.

1. MASTER AND SERVANT—SAFE MACHINERY—ACT OF FELLOW SERVANT.

The theory of the defense, in a suit for personal injuries resulting from the explosion of the boiler of a locomotive at rest, that the explosion was caused by the sudden generation of steam consequent upon the letting in of cold water upon a heated surface by plaintiff's fellow servant, should be recognized in the charge to the jury,—where there is evidence that such fellow servant had opened the fires to raise the steam pressure; that he ran the engine down the track, banked her fires, and left her, but 15 minutes before the explosion; that the safety valve and other parts of the engine were in good order; that she had been regularly and duly inspected; that the steam pressure, before the explosion, was low; and that the engine, the day before, had made a run of 179 miles over steep grades, with a heavy train, under full pressure. Per Speer, District Judge, dissenting.

2. SAME—SELECTION AND INSPECTION OF MACHINERY.

It was error to refuse a charge that the verdict should be for the defendant if the jury should find that the defendant used ordinary care in the selection of an engine, and in the selection of competent persons to inspect and manage it,—where there was evidence that the engine was one of the best makes; was but little over two years old; had been thoroughly tested but a month before the accident; and that, in the year preceding the explosion, she had been in the shop for three or four weeks, and was thoroughly overhauled. Per Speer, District Judge, dissenting.

3. SAME—ORDINARY CARE.

This requested charge is not sufficiently covered by an instruction that the defendant is bound to use ordinary care in the selection of safe machinery and appliances for use by its employés. Per Speer, District Judge, dissenting.

These were actions brought against the Texas & Pacific Railway Company by R. J. Thompson and S. M. Dietz, respectively, to

recover damages for personal injuries sustained by them, while in its employment, through the explosion of a locomotive boiler. In each of the cases there was a verdict for plaintiff, which was duly affirmed, upon writ of error. 70 Fed. 944.

SPEER, District Judge, dissented from this decision, filing the following opinion:

I feel obliged to submit certain grounds of difference with a majority of the court in this case, and, indeed, in all of the cases growing out of the explosion of the engine which caused the injuries sued for. There were two theories explanatory of the explosion of the engine which resulted in the injury to the plaintiff. They were maintained, respectively, by the plaintiff and defendant in the circuit court. The plaintiff's reliance was upon the theory that the explosion resulted from corroded and weakened stay bolts connecting the outer plates of the boiler with the inner compartment, that these defective bolts were not sufficiently strong to resist the expansive energy of the steam, and that this condition resulted from the negligence of the company, and on this account that it is liable for the injuries the plaintiff sustained. The defendant's theory was that the explosion came from the rapid generation of steam in the boiler of the engine, as it stood in the roundhouse, that the accumulation of steam was so rapid the valves could not relieve the enormous and sudden pressure, and that the explosion of the boiler resulted from this cause, rather than from any infirmity of the stay bolts. The defendant insisted, further, that since the steam, so dangerously generated, resulted from the negligence of the hostler, a fellow servant of the plaintiff, the familiar rule exempting the master from liability to a servant for the negligence of a fellow servant denies the plaintiff the right to recover.

It cannot, I think, be disputed that there was evidence to support the theory of the defendant, to which it was the duty of the court at least to direct the attention of the jury. From the evidence in this and several cases brought because of the same explosion, it seems that the cause of the accident is not free from fair doubt. In the case of Railway Co. v. Barrett, 14 C. C. A. 373, 67 Fed. 217, resulting from the same explosion, which the majority of the court follow in this case, his honor, Judge Bruce, remarks:

"The leading fact in this case is the explosion of the boiler while the locomotive was at rest, standing in the yard of the company, with no extra pressure of steam, waiting to take out a train."

This observation would seem conclusive, if, indeed, there was no extra pressure of steam on the boiler, and that fact had been found by the jury, after a proper submission of the issues by the court. The learned judge remarks, additionally, that "the science of physics is in aid of an effort to discover the cause." The science of physics will obviously play its part in all such inquiries, but the science or art of charging a jury would seem to be auxiliary to the effort to discover the cause of the explosion, and also to ascertain if the plaintiff is liable on account of it. That is the science the plaintiff in error invokes. Upon this science we fortunately have much assistance from

acknowledged authority.    It may be well to cite briefly from the more convincing.    In the case of Railroad Co. v. Bryant, 6 C. C. A. 158, 56 Fed. 803, Circuit Judge McCormick, for the court, uses this pertinent language:

"It is the duty of the trial courts to bring these real issues clearly to the attention of the jury, and, especially in those personal injury cases where the liability rests, often, not on any issue as to the fact or extent of the injury, but on the proof of negligence on the part of the party sued, care should be taken to bring to a focus, on the real issue in the case, the light of instructions applicable to all the material evidence on that issue."

This is a clear and accurate statement of the duty of the court in just such cases.    Now, let us see if his honor, Judge Rector, conformed in any manner with the lucid rule defined by the court in that case.    The defendant, among a number of other written requests to charge, asked the court to instruct the jury as follows:

"You are instructed that, if you believe from the evidence that the explosion in question was caused by the letting in of cold water upon a heated surface, and the consequent sudden generation of steam, to relieve which the safety valve was inadequate, you will find for the defendant, because the letting in of such water would be the act of plaintiff's fellow servant, for which defendant would not be responsible."

In the expressive language of Judge McCormick, this request to charge was framed "to bring to a focus on the real issues in the case the light of instructions applicable to all the material evidence." The judge refused it.    Instead of focusing the rays until, if I may venture to enlarge the apposite illustration above quoted, they might resemble a search light, by means of which the jury had been enabled to "pick up" the buoys, avoid the rocks and shoals, and pursue the true channel, they were refracted by the following axiomatical, but inapplicable, observation:

"If the boiler that exploded and injured plaintiff was reasonably safe for the purposes for which it was being used, and it exploded, not by reason of any defect in its stay bolts or rivets, but by an excessive head of steam, then you will find for the defendant."

Now, it was no part of the defendant's case to insist that an excessive head of steam, generated in the usual manner, brought about the explosion.    There was no evidence to that effect, but, on the contrary, more than one witness for the defense testified that the safety valve of the engine was in good order, and therefore an excess of steam gradually developed would have escaped.    In view of this instruction, the jury were justified in ignoring the theory of the defense, viz. that injecting cold water on the heated surface of the boiler caused such sudden generation of steam that it could not escape fast enough through the valves, and the explosion followed. That was the real issue, in view of which defendant requested the instruction refused, and there was significant evidence to support it. Wesley F. White, a "hostler," and not an engineer, was the last man who handled the engine before the explosion.    He testified that he was on her only 15 minutes before the explosion.    He ran her out of the roundhouse across the turntable.    She had about 120 pounds of steam on when he left her.    She had so little steam before that he had

some difficulty to get her off of the turntable.    He said, "I opened
up her fire a little, and run up her steam to 120 pounds," and then,
he said, he ran her down on the wood track, banked her fires again,
and left, to bring in an engine which had just come in from the west
and was leaking badly.    How successful he was, in his hurried de-
parture, in arresting the increase of steam he thus began to gen-
erate is somewhat doubtful, and in his evidence he omitted any men-
tion of the fact that he got her off the track.    Thompson, who is a
plaintiff in one of these cases, who was also injured, testified that,
in coming off the turntable under White's direction, she dropped off
the track with the fore pair of engine-truck wheels.    Wells, fore-
man of boiler makers, testified that it took a great deal of steam to
get an engine on the track when she got off.    This witness, who
was experienced and intelligent, said, "You will want all the pressure
allowed to pull her back on the track."

Most material evidence, as illustrating the refusal of the court to
give this instruction, is that of W. C. Sample.    He was a locomotive
engineer.    He said:

"I have been locomotive engineer pretty near 10 years. I remember engine
219, that exploded, at Ft. Worth, in February, 1893. I ran that engine into
Ft. Worth the last trip she made before the explosion. That was in the
evening of the 18th of February (I believe), 1893. When I carried her into
the roundhouse at Ft. Worth on the evening of February 18, 1893, the con-
dition of the engine, machinery and all, so far as I could see, was good.
There was no leakages; no rivets broken as I know of; no leaks from rivets;
no bulging about the boiler that I could see. She was a good steamer. Before
that time I had run that engine about two or three trips, and her condition
all that while had been good. On the last trip that I ran her into Ft. Worth,
she carried between 145 and 146 pounds of steam. Coming down hill into
Ft. Worth, her pop valves relieved all right. On my arrival in Ft. Worth,
the amount of steam on it would not pop, you know. She had gone down in
steam, but going down hill she was all right, coming in. The valve was in
good condition going into Ft. Worth. The object of that pop valve was to re-
lieve the boiler. We are supposed to carry 150 pounds of steam. That is
what we are allowed by the company,—150 pounds of steam to the square inch.
This valve popped at about 146. It don't require any steam to take an engine
down hill. She will roll down hill. Up hill, it depends on the train. If we
have a full train of very heavy cars, it takes all the steam we are allowed,
and lots of times we cannot get up that way. We have to double. When I
ran engine 219 into Ft. Worth, as well as I can remember, I had a full train,
—twenty loads. To go up hill I used all the steam she would carry,—146
pounds. There were lots of hills on my route. From Marshall to Ft. Worth
is 179 miles."

Surely, such facts strongly impugned the theory that this engine
exploded under a merely nominal pressure, because of defective stay
bolts, when the day before, for 179 miles, she successfully drew a
heavy train over steep gradients and with a full pressure of steam.
In my opinion, the court should have directed the attention of the
jury to this valuable evidence for the defendant, and should, assur-
edly, have given at least the pertinent instruction requested.    It
was specially adapted to the facts on which the defense relied.    Rail-
way Co. v. Reed (Tex. Sup.) 31 S. W. 1058, 1059.

But the refusal of this instruction is not, in my opinion, the only,
or the chief, error in the submission of this case to the jury.    Coun-

sel for defendant requested the court to give the following instruction:

"You are instructed that, if you believe, from the evidence, that defendant used ordinary care in the selection of the engine in question, and used the same care in the selection of a competent man to inspect it and keep it in a reasonably safe condition, and if you believe, from the evidence, that the person so employed to inspect said engine and keep it in repair did exercise ordinary care in its inspection and good condition, you will find for the defendant."

It was proven that this was a Baldwin engine,—one of the best made, by one of the best makers; that it had been regularly inspected by a competent inspector, and regularly tested by the usual test. An eyewitness, a helper of the inspector, testified that he held the iron for the hammer test a month before the accident; that there was not an unsound stay bolt in the boiler. This was the usual test. The locomotive was received, brand-new, in Texarkana on the 2d of December, 1890. She exploded on the 19th day of February, 1893. She had therefore been but little more than 2 years and 2 months in use. The life of an engine is from 25 to 30 years; of a boiler from 15 to 20 years. In 1892 she was in the shop 3 or 4 weeks, and was thoroughly overhauled. These facts are not in dispute; and the request relative thereto, above stated, I think was demanded by them. But it is held by the majority of the court that the request is sufficiently covered by the following instruction, which is given:

"A railway company is bound to use ordinary care to furnish safe machinery and appliances for use by its employés in operating its road, and if ordinary and reasonable care is not exercised by the company to do this, it would be responsible for the injuries to its servants caused by such neglect. The neglect of the servant to whom the company intrusted such duties is the neglect of the master. By ordinary care is meant such as an ordinarily prudent man would use under the same circumstances. It must be measured by the character and risks of the business; and where the person whose duty it is to repair the appliances of the business knows, or ought to know by the exercise of reasonable care, of the defects in the machinery, the company is responsible for his neglect. If the jury believe, from the evidence, under the foregoing instructions, that the boiler which exploded and injured plaintiff was defective and unfit for use by reason of the cracked and broken condition of the stay bolts that held same together, and that defendant's servants, whose duty it was to repair said machinery, knew, or by the exercise of reasonable care might have known, of such defects in said machinery, then such knowledge upon part of its servant is imputable to the defendant; and if said boiler exploded by reason of such defects, and injured the plaintiff, the defendant would be responsible for the injuries inflicted on plaintiff by such explosion, if plaintiff in no way, by his own neglect, contributed to his own injury."

This language of the learned judge is a correct announcement of law. It is, however, not what a charge to the jury in such a case is intended to be. It affords the jury no assistance in the determination of the particular case made by the actual issues of fact. Let us suppose that the contention of the defendant is true as to the performance of all the details of duty, amounting, in the aggregate, to ordinary care. The proper selection and preservation of an engine are, necessarily, a succession of details. Is it not reasonable, nay right, especially when requested, that the court should sum up these duties, and say, if the defendant has done all of these things, and an

explosion nevertheless ensues, it is a casualty of a dangerous employment, and the law will not charge the employer with consequences which he has used all reasonable care to avoid? Is the jury to have no assistance from the court? Will the judge decline to direct their minds to what are the controverted issues in the case on trial, upon the decision of which the presence or absence of ordinary care will be ascertained? What more adequate direction could have been given than that afforded by the instructions requested and refused? The selection of the engine, its inspection, its care and preservation, the competency of the men intrusted with these duties, were all designated. Unless the company is obliged to insure the engine, and this the law does not require, what more can be demanded of it? And then to say, "By ordinary care is meant such as an ordinarily prudent man would use under the same circumstances!" An ordinarily prudent man, unless he had special training, would have nothing to do with a locomotive engine. He would be criminally negligent if he did. Reasonable care, in such a case, is a question of technical selection, tests, management, and control; and the definition given in this case is therefore wholly inadequate.

The supreme court in Railway Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 679, hold as follows:

"What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonably prudent men under a similar state of affairs."

Surely, then, a request that the court would direct their attention to the special circumstances and surroundings was a request for proper instructions. Indeed, when the facts are such that all reasonable men must draw the same conclusion from them, the question of negligence is one of law for the court. Railway Co. v. Ives, supra. Such generalizations in instructions to juries as the plaintiff in error complains of leave nearly all corporations, a large class of other litigants, and often the government itself, at a great disadvantage in the courts. They impart to concluding arguments of able counsel a determinant influence not always justified. The supreme court of the United States, in most felicitous language, clearly defines the duty of the judge in the trial court, even where no written instructions are requested:

"The line which separates the two provinces (viz. of the court and jury) must not be overlooked by the court. Care must be taken that the jury is not misled into the belief that they are alike bound by the views expressed upon the evidence and the instructions given as to the law. They must distinctly understand that what is said as to the facts is only advisory, and in no sense intended to fetter the exercise, finally, of their own independent judgment. Within these limitations, it is the right and duty of the court to aid them by recalling the testimony to their recollection, by collating its details, by selecting grounds of preference rather than contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts, and their combined effect, stripped

of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their functions wisely and well without this aid. In such cases, chance, mistake, or caprice may determine the result." Nudd v. Burrows, 91 U. S. 439.

Nothing would do so much to cripple the usefulness of the national courts, to render trials more uncertain, new trials frequent, and the law's delay inevitable, as the abolition of this practice, or its abandonment by the courts. The jury should be made, so far as it is proper within the limitation fixed by the supreme court, to understand the case as thoroughly as it is understood by the judge.

We have to consider, in several cases resulting from this accident, verdicts against the defendant company aggregating thousands of dollars. Indeed, the plaintiff's counsel have felt obliged to remit a portion of the recovery. One of these cases (Railway Co. v. Barrett, 14 C. C. A. 373, 67 Fed. 214) is now pending before the supreme court of the United States on appeal. I preferred to postpone the decision in the cases now under consideration here until the supreme court had passed on that case; but, since that was not deemed proper, with great deference to my learned brethren and to the cultured and distinguished judge who presided in the circuit court, I must dissent from the judgment of affirmance.