## ABBOTT and others *v.* CURTIS & Co. MANUF'G Co.[1]

*(Circuit Court, E. D. Missouri.* October 30, 1885.

1. PRACTICE—VERDICTS—ACT OF 1872.
   The provisions of the act of 1872, requiring conformity to state practice, do not apply to the form of verdicts.

2. SAME—COUNTER-CLAIMS.
   Where in a suit on promissory notes, the answer contains counter-claims, it is proper to instruct the jury to ascertain the rights of all parties, and strike a general balance, and give a verdict for the amount of the balance. It is unnecessary in such cases for the jury to find on each count of the petition and each count of the answer separately.

3. BAILOR AND BAILEE—INSURANCE—STORAGE.
   Where A. left goods in B.'s hands without any agreement as to storage or insurance, but with the understanding that they should be subject to his order, and that B. should use what he wanted, and pay for what he used, and B. insured the goods, *held,* that A. was not liable to him for either storage or insurance, upon a final settlement.

At Law.

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

Suit on four promissory notes executed by the defendant and made payable to the plaintiffs. The answer states that the notes sued on were made and delivered in consideration of a part of several invoices of steel saw-plates, theretofore sold and delivered to the defendant by the plaintiffs, and which were warranted sound and fit for use, and that the portions of said plates which proved defective on trial were of value largely in excess of the notes sued on; and that, being notified of that fact, the plaintiffs, in October, 1884, canceled said sale of plates, and received the unused plates back again, and agreed to cancel said notes. Further answering, the defendant set up two counter-claims,—one for $190, under an alleged agreement by plaintiffs to pay the defendant as much as it should lose in unsuccessful attempts to manufacture plates out of the lot returned, into saws, and one under an alleged agreement by plaintiff to repay to defendant the prices paid by defendant for the saw-plates returned in October, 1884, ($6,590.50,) less the amount of said notes, being a balance of $3,826.73. There was a jury trial, and the court charged as follows:

TREAT, J., (*orally.*) Gentlemen of the jury, I know not that the court can aid you very largely in this matter, because the case is one of accounting, which it is for you to determine. There are a great many technical propositions which have been submitted, and which, for the purpose of determining this case, it is unnecessary to instruct you about. The question is whether there is anything due from the defendant to the plaintiffs, or *vice versa.* What is the balance of the account, and in whose favor is it, and for what amount? You have noticed what the course of dealing has been between these parties. It seems to be admitted,—it has been abundantly proved,—that this defendant bought these saw-plates with a guaranty, if not expressed certainly implied, and therefore a guaranty that the defendant should be credited for all defective plates. The business in one aspect may be a little peculiar. When plates were ordered and sent forward invoiced, notes were to be executed for the full value thereof with the understanding that if any of these plates proved defective the party defendant should be credited the invoiced value thereof, and, if it so happened, that when the value of these defective plates was ascertained to be equal to any one of the series of notes for which there was a series of shipments, they would surrender a note in that amount. That was the course of the trade.

It seems that in January, 1884, there was a settlement,—that is, the $1,600 and $400 matter,—therefore I think it hardly necessary to go behind that item, because the parties chose to sell to the party defendant the rejected plates then on hand, making an allowance. They settled the affairs between them up to that time. The business ran on afterwards until we get down to the alleged agreement in December; that is, the $6,000 agreement. In the intermediate time, as one of the jurors has asked, it appears that certain notes were surrendered because the defective plates had been sufficiently ascertained to amount to at least the face value of those notes. The point which I sought to ascertain by my inquiries, and which the juror did, pursuing the same line of thought that was in my mind, was whether that was a final settlement. It appears not to have been a final settlement, and never was a final settlement. This left the matters where we are to-day. Now, it is alleged that in December, 1884, there was an interview between these parties with regard to these defective plates. It is stated on the part of the defendant here that all these matters—the $6,000 and something—were to be considered

as rejected plates; and they settled the matter on that basis at that time. If, however, (which is its contention,) the plates were to be left in the hands of this defendant, something must be done with those. What? Was the party defendant to keep those plates indefinitely, subject to the order of the plaintiffs? On the other hand, if the party defendant was to keep those subject to order, on what terms should he be allowed storage for them? Had he the right, if he stored them, to charge insurance? It occurs to me, gentlemen, as far as that item of insurance is concerned it should be rejected, because no agreement in any of these arrangements between principal and factor ever involves the question of insurance unless there is an express agreement to that effect. Hence that little item can be rejected.

It is charged by the defendant that as a variation of that agreement the defendant might go on, and was urged to go on, and get out of this whole rejected lot the $6,000 and something, and see if they could not lessen the amount of that. If he did so, he was to pay the invoiced value therefor, but if in the course of his experimenting for the benefit, in one sense, of the plaintiffs, it turned out that the particular plate was bad, he should pay the cost and expense of that. Now whether that is so or not is a matter of dispute. If you think there was such an agreement, very well,—allow him that amount, $190 and something; if you do not, reject it. Ordinarily such an agreement would not exist, as Mr. Branch told you. Nothing short of an express agreement to that end would permit that item to be allowed. If they, however, agreed that the defendant should go on experimenting with the so-called rejected plates and be allowed for its labor, and some of them turned out bad, then said sum would be allowed; otherwise not. This business is a little peculiar in some of its aspects. Notes were given, as is not denied, and as all the testimony shows, for the invoiced price of those goods when received, with the understanding that when defective plates appeared credit should be given therefor. Now, as an ordinary rule of law controlling those matters, the party giving notes under such circumstances must pay them unless he shows that he is entitled to credit. The proof is on him to show that they were defective plates which ought to be credited on the notes. There is, gentlemen, a peculiarity that seems to trouble the jury, as it does the court, in regard to this matter. Here were defective plates from time to time which turned out to be defective. What was to be done with them? Whose property were they? You have heard a great deal in the course of the argument in regard to that. Were they to be left in the defendant's hands as the property of the plaintiffs? Whose property were they? If they gave credit to the defendant for the full value, certainly they were entitled to the defective plates. Was the defendant bound to keep them indefinitely as rejected? What was to be done with them? I asked the question of the counsel and one of the witnesses, I think, in the course of the examination, he having used the terms "billed back," which all merchants understand to be shipped back. But it seems that was not the course of business. He did not ship back, and here they lay on the hands of this defendant. Now, what was to be done with them? That is one of the difficulties of the case. The defendant, as these matters accumulated on his hands, finally wished to close the whole business. He advertised and sold them for the sum named, $1,860. True, it appears that he became the purchaser, but that cuts no figure as to who the purchaser was. The net amount of that sale should be credited to the plaintiff.

A great deal is said in the course of this correspondence about consignments, and a point was made by way of contention here with regard to the technical meaning of that term "consignment." Technically there was no consignment; but it is unnecessary to go into that matter, because this transaction is outside of all such technical questions. If I understand it correctly, here were rejected plates. Parties understood that credit should be given for

them. It was done. The rejected plates were here. They were plates belonging to this plaintiff, the shipper. If he did not choose to remove them, there they were. What was to be done with them? If the understanding was, as contended here, that "you hold on to these plates, experiment on them, and see if you can find some good ones out of them, and pay us for the good ones; and if in the course of your experimenting you incur labor, we will pay you for the labor," then these parties stood in the relationship, not technically of consignees, but of bailee of the other party, holding the property for the benefit of the plaintiffs, and the plaintiffs must pay accordingly.

Now, the elements of accounting are: First, charge against the defendant the amount of these notes. Credit him, (if you reach a conclusion that the $6,000 and odd matter was the adjustment of the plates in December,) credit him with that amount. Then this labor item,—you will have to consider if there was an agreement. If you don't think there was such an agreement, cut out that, and cut out the insurance, and if there was no agreement in regard to storage, cut that out, and take the net value of the final sale, and charge that against the defendant, and I think you can reach a conclusion.

The verdict of the jury was as follows:

"We, the jury, find for plaintiff in the above-entitled cause in the sum of twenty-four hundred and seventy-three 39-100 dollars."

Thereupon the defendant filed a motion for a new trial upon the following grounds, to-wit:

"*First.* That said verdict is against the evidence and the weight of evidence. *Second.* That said verdict is contrary to the instructions or charge of the court upon the evidence. *Third.* There is no finding on the counterclaims set up by defendant. *Fourth.* The verdict is irregular, improper, and unintelligible under the pleadings and evidence.

*W. B. Homer,* for plaintiffs.

*George M. Stewart,* for defendant.

Treat, J., (*orally*.) In the case of Jerre Abbott and others against the Curtis & Co. Manufacturing Company (Mr. Stewart on the one side and Mr. Homer on the other) the charge of the court, as requested, has been written out. It involves a great many other cases that are arising before the court; one case in particular, in which Mr. Overall and Mr. Cunningham are concerned. The proposition substantially is this: While under the act of 1872 the federal courts conformed to the practice, pleadings, etc., of the various states in which federal courts are administering law, does that statute go to the extent of requiring the federal courts to pursue whatever there may be in the local statutes with regard to instructions to the jury, and their modes of rendering a verdict? Here was a demand on promissory notes. There was an underlying agreement that if any of the plates which were in consideration of the notes should prove defective, there should be a deduction on that account. It was contended on the part of the defendant that there was a December agreement by which a large mass of these plates should be credited to the defendant,—they say the sum of $6,000. That was the point of dispute. Testimony was given on the one or the other side varying very greatly. The jury chose to find, and this court will not review their finding, that there was no such agreement; that under the instruc-

tions of the court, if they found that was so, they should credit the $6,000; if they found it was not so, they should credit any defective plates that might have been ascertained. They found on the theory, unquestionably, in looking through the testimony, that there was no such agreement by way of settlement, in December, but that there were defective plates which had been sufficiently proved, and they made a full allowance therefor. One of the gentlemen of the jury, under the direction of the court, kept a detailed account of all those matters. He seemed to be, and I presume was, quite as intelligent as the court itself in analyzing the debit and credit account, and the jury settled it accordingly.

So far as the amount is concerned, I cannot see that the jury committed any error. The other point presented is, that inasmuch as there was a counter-claim the jury should have found specifically— there being a series of notes sued on by the plaintff—with regard to each, and separated them in its verdict, and separated also the counter-claims to the extent that they might allow the same, and find specifically on each count of the petition, and also on each counter-claim. I am very well aware of the rulings of the supreme court of the state of Missouri, and also of state statutes, and I have disregarded them in the light of the decisions of the supreme court of the United States; so the ruling which I shall make on this point, if the question should be presented again, shall be broad enough to cover all this class of cases. It is very important, that it should be understood what the ultimate decisions of the supreme court of the United States are on these questions. In 91 U. S. 426, (the case of *Nudd* v. *Burrows*,) those matters were before that tribunal. I will read what the court said:

"The line which separates the two provinces must not be overlooked by the court. Care must be taken that the jury is not misled into the belief that they are alike bound by the views expressed upon the evidence and the instructions given as to the law. [I had occasion during this term to administer a very sharp rebuke to the jury in regard to that. They seemed to think they could take the law and do as they pleased with it.] They must distinctly understand that what is said as to the facts is only advisory, and in no wise intended to fetter the exercise finally of their own independent judgment. Within these limitations, it is the right and duty of the court to aid them by recalling the testimony to their recollection, by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts, and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid. In such cases, chance, mistake, or caprice may determine the result."

In other words, every one familiar with the common law knows that that was the proper proceeding. But the next question, which is the

most important, is under this statute to which reference was made in this particular case, and in some other cases. There was an assignment of errors in the case cited from the United States supreme court, viz.:

"That the court erred in matters of practice. Before the judge began his charge to the jury the counsel for the defendants requested him, in giving it, to conform in all things to the practice of the courts of record and the law of the state. This he refused to do. He also refused to allow the jury to take with them to their room the written instructions he had given them, and likewise the account-book, bills of lading, and additional papers, which had been introduced in evidence, other than the depositions. To each of these refusals the defendants excepted. [This is a case from the Northern circuit of Illinois.] The practice act of Illinois provides that the court in charging the jury shall instruct them only as to the law of the case; that no instruction shall be given, unless reduced to writing; that instructions asked shall not be modified by the court, except in writing; that the instructions shall be taken by the jury in their retirement, and returned with the verdict; and that papers read in evidence, other than depositions, may be carried from the bar by the jury. It is declared by the act of congress of June 1, 1872, 'that the practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the circuit and district courts, shall conform as near as may be' to the same things 'existing at the time in the courts of record of the state within which such circuit and district courts are held.'"

That was the point distinctly presented to the supreme court of the United States. The court says:

"The purpose of the provision is apparent upon its face. No analysis is necessary to reach it. It was to bring about uniformity in the law of procedure in the federal and state courts of the same locality. It had its origin in the code enactments of many of the states. While in the federal tribunals the common-law pleadings, forms, and practice were adhered to in the state courts of the same district the simpler forms of the local code prevailed. This involved the necessity on the part of the bar of studying two distinct systems of remedial law, and of practicing according to the wholly dissimilar requirements of both. The inconvenience of such a state of things is obvious. The evil was a serious one. It was the aim of the provision in question to remove it. This was done by bringing about the conformity in the courts of the United States which it prescribes. The remedy was complete. The personal administration by the judge of his duties while sitting upon the bench was not complained of. No one objected or sought a remedy in that direction. We see nothing in the act to warrant the conclusion that it was intended to have such an application. [That is, that the proceedings of the judge charging the jury shall be controlled by the local statute.] If the proposition of the counsel for the plaintiff in error be correct, the powers of the judge, as defined by the common law, were largely trenched upon. A statute claimed to work this effect must be strictly construed. But no severity of construction is necessary to harmonize the language employed with the view we have expressed. The identity required is to be in 'the practice, pleadings, and forms and modes of proceeding.' The personal conduct and administration of the judge in the discharge of his separate functions, in our judgment, are neither practice, pleading, nor a form nor mode of proceeding within the meaning of those terms as found in the context. The subject of these exceptions is therefore not within the act as we understand it. There are certain powers inherent in the judicial office. How far the legislative

department of the government can impair them to dictate the manner of their exercise are interesting questions; but it is unnecessary to consider them."

Now as to the particular case in hand. Here were counter-claims and different counts, and the controversy was as to where the balance belonged. The court charged, and it has been reduced to writing, substantially, that the rights of all the parties were to be ascertained by the jury, as they kept the details, by striking a balance. If there were any of those counter-claims which ought to be allowed, the court instructed the jury in regard to them to allow them and strike the balance. The contention now is that there was error; that the jury ought to have found on each count in the petition, and separately on each count in the counter-claim. In the light of what I have read with regard to it, I consider that it was wholly unnecessary for the jury to go through a long examination of accounts between the parties, and separate them in their verdict, but that they could allow, as they did, evidently in this case, some thousand dollars of the counter-claim, and strike a balance. The matter substantially involved in the motion for a new trial is that they ought to have found separately with regard to each issue out of the many issues presented. The supreme court has held otherwise, and I am fully in accord with it; and the motion for a new trial will be overruled.