RUSSELL et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 14, 1926.)

Nos. 4473–4475.

1. Criminal law ⟂762(2)—Federal judge, in submitting case to jury, may express opinion on facts, provided no general rule of law is incorrectly stated, and jury is given to understand they are not bound by opinion.

In federal courts, the judge, in submitting case to jury, may in his discretion express opinion on facts, provided no general rule of law is incorrectly stated, and jury is given to understand they are not bound by judge's opinion and that comments are judicial and dispassionate.

2. Criminal law ⟂758.

Federal judge may state his opinion on credibility of witnesses, including that of defendant himself.

3. Criminal law ⟂807(1)—Although charge must not be argumentative so as to constitute advocacy, testimony corroborating judge's opinion or testimony of other witnesses may be referred to.

Although court's charge must not be argumentative to degree making it an act of advocacy, there is no impropriety in referring to and citing testimony as corroborating judge's opinion or as corroborating testimony of other witnesses.

4. Criminal law ⟂756—Full summing up by trial judge, in prosecution lasting practically 8 days, with 49 witnesses and 119 paper exhibits, more or less technical, held especially fitting.

In prosecution lasting practically 8 days, with 49 witnesses and 119 paper exhibits, more or less technical, full summing up by trial judge was especially fitting.

5. Criminal law ⟂768(3)—Judge's charge, summing up case and expressing opinion on certain phases, held not to justify conclusion that jury was coerced (Penal Code, § 37 [Comp. St. § 10201]).

In prosecution for conspiracy under Penal Code, § 37 (Comp. St. § 10201), judge's charge summing up testimony and expressing his opinion on certain phases held not to justify a conclusion that jury was coerced.

6. Criminal law ⟂757(1).

Reference in judge's charge to motives of witnesses for testifying one way or another held proper.

7. Criminal law ⟂757(1).

Expression of opinion by trial judge that he believed witness to be credible witness held not improper, where jury were instructed that such opinion was not binding on them.

8. Criminal law ⟂788.

Reference of trial judge to defendants' failure to call certain witness held not error, where jury were told they were not bound by judge's opinion.

9. Criminal law ☞1144(14)—Circuit Court of Appeals will not assume that trial judge, by unjudicial manner and emphasis on certain words, gave coercive effect to expressions proper on their face.

Circuit Court of Appeals will not assume that trial judge, by unjudicial manner and emphasis upon certain words gave a coercive effect to expressions otherwise, and on their face, proper.

10. Criminal law ☞811(1)—Charge of trial court held not criticizable as giving less prominence in summing up to defendants' side than to that of government (Penal Code, § 37 [Comp. St. § 10201]).

Charge of trial court in summing up case, in prosecution for conspiracy under Penal Code, § 37 (Comp. St. § 10201), held not criticizable as giving less prominence to defendants' side than to that of government.

11. Criminal law ☞829(1).

Refusing requested charges, subject-matter of which was sufficiently covered by charge of court on its own motion, held not error.

12. Criminal law ☞1153(4)—Ruling of trial court, allowing witness to assert privilege because of tendency of testimony to incriminate him, will not be reversed, in absence of manifest error.

In absence of manifest error, ruling of trial court, allowing witness to assert privilege because of fact that testimony would tend to incriminate him, will not be reversed.

13. Witnesses ☞307.

Witness claiming privilege because of tendency of evidence to incriminate him is not required to show how incrimination might occur.

14. Witnesses ☞308—Action of trial court in allowing witness to claim privilege because of tendency of testimony to incriminate him held within permitted exercise of sound discretion.

Action of trial court in permitting witness to claim privilege in refusing to testify because of tendency of testimony to incriminate him held within permitted exercise of sound discretion.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Joshua E. Russell and others were convicted of conspiracy to withdraw from a distillery warehouse a large amount of whisky, and unlawfully possess, transport, accept, receive, and sell such whisky, and to defraud the United States of taxes thereon, and they bring error. Affirmed.

Luther Day and Joseph C. Breitenstein, both of Cleveland, Ohio (Day & Day, of Cleveland, Ohio, and Charles S. Druggan, of Columbus, Ohio, on the brief), for plaintiffs in error.

A. E. Bernsteen and Miles E. Evans, both of Cleveland, Ohio (D. C. Van Buren, of Cleveland, Ohio, on the brief), for the United States.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiffs in error were jointly indicted, together with seven other defendants, upon charges of conspiracy under section 37 of the Penal Code, being Comp. St. § 10201 (by the first count) to withdraw from a distillery warehouse, and sell for beverage purposes, a large amount of whisky legally withdrawable for nonbeverage purposes only, and under such conspiracy to commit divers offenses against the United States of unlawfully possessing, transporting, accepting, receiving, and selling such whisky; and (by the second count) to defraud the United States of upwards of $90,000 by way of additional taxes of $4.20 per gallon to which the government would be entitled upon sale for beverage purposes. From about September 1, 1921, plaintiff in error Russell was prohibition director of the state of Ohio, with offices at Columbus. From September 15, 1921, plaintiff in error Copeland was prohibition agent under, and executive clerk of, Director Russell, and in charge of permits. Plaintiff in error Barnett was an attorney living and doing business at Columbus, Ohio. Another defendant (Grossberg) acquired warehouse receipts for 22,416 gallons of whisky deposited in the Hayner Distillery Warehouse at Troy, Ohio, which was subject to withdrawal for nonbeverage purposes only. Another defendant (Gardos) was president of the Armand Drug & Candy Company, of Cleveland, Ohio (hereinafter called the drug company), which had a basic permit to procure and sell distilled spirits in connection with its business, to others holding permits to purchase and use the same for such purposes. One Abe Ungerleider, a broker, was alleged in the indictment to have been a party to the conspiracy, but not indicted because of having testified before the grand jury concerning matters charged in the indictments. Each of the seven defendants other than the three plaintiffs in error pleaded guilty. Grossberg and Gardos, as well as Ungerleider, testified for the government. Each of the plaintiffs in error was convicted on both counts, and sentences were imposed accordingly. A brief reference to the nature of the testimony and the contentions of the parties should be helpful to a discussion of the alleged errors relied upon for reversal.

The government's testimony was to the

general effect that between November, 1921, and May, 1922, by virtue of the alleged conspiracy, about 22,000 gallons of whisky were withdrawn for pretended nonbeverage purposes from the Hayner Distillery upon Grossberg's warehouse receipts, under applications in the name of the drug company, prepared by Grossberg on form 1410, and founded upon the drug company's basic permit before referred to; that these applications were delivered by Grossberg (all under authority from Gardos) to Ungerleider and by the latter to plaintiff in error Barnett; that the permits to the drug company to make purchases, issued by plaintiffs in error Russell and Copeland, one or both, on form 1410-A, were in turn delivered personally by Barnett to Ungerleider and by him to Grossberg, who then obtained the whisky from the distilling company, and caused it to be turned over at the drug company's warehouse to defendant Higgins, who gave Grossberg payment therefor; the latter delivering it to Ungerleider, who paid plaintiff in error Barnett, on each occasion, a large sum of money on account thereof. The testimony is to the effect that Higgins bought the whisky for bootlegging purposes, paying more than $500,000 therefor. Ungerleider testified to statements by Barnett to the effect that Russell had been appointed prohibition director as "my [Barnett's] party"; also that Copeland and others were receiving part of the money delivered to Barnett by Ungerleider. In the brief of plaintiffs in error Russell and Copeland, it is said:

"There is no doubt that there was a conspiracy of the general character described in the indictment, and that the defendants other than Russell, Copeland, and Barnett were parties thereto; the question of fact to be decided by the jury in this case being whether Russell, Copeland, and Barnett were also involved as coconspirators with those who have admitted their guilt. And there is no doubt that about 22,000 gallons of Hayner whisky were withdrawn from the distillery at Troy, transported to Cleveland and thence to Youngstown and elsewhere; such withdrawals being made upon applications filed by the Armand Company by virtue of its basic permit for the years 1921 and 1922. It is conceded also by the defendants Russell and Copeland that the liquor was withdrawn while they were in charge of the prohibition office, and that the withdrawal permits therefor were approved by them or either of them acting in their official capacities. * * * It is the contention of Russell and Copeland that the liquor was with-

drawn by the Armand Company upon withdrawal permits under the basic permit in accordance with the law upon the subject, and that they both and each of them had no knowledge whatsoever that the liquor was to be used for illegal and beverage purposes. * * * *"

Barnett denied all connection with the conspiracy or with the liquor transactions in question, and disputed the testimony of Abe Ungerleider practically in toto.

There was a large amount of documentary and other evidence strongly tending to show that Russell and Copeland were parties to the conspiracy. T. D. No. 3208, effective August 15, 1921 (15 days before Russell's incumbency and 30 days before Copeland's) limited the amount of potable liquor—not including high proof alcohol—which a wholesale druggist might withdraw in any month to 10 per cent. of the average monthly amount in money of bona fide business done by such druggist, exclusive of the sale of intoxicating liquors, during the preceding quarter, and, to effectuate such limitation, required the filing by such company of monthly reports of the amount of its business other than liquor and of the sales of liquor during the preceding month. Reports of neither of these classes seem to have been made by or required of the Armand Drug & Candy Company during the period in question. The drug company had not, for some time at least before the conspiracy period, been withdrawing whisky, but had been withdrawing alcohol in comparatively small amounts.

The claim of Russell and Copeland that their first knowledge of T. D. No. 3208 was late in 1921 or early in 1922 is disputed as to the 10 per cent. limitation by documentary evidence of official notice from the office of the prohibition commissioner of September 7, 1921 (acted upon by the defendant Russell), to restrict withdrawals of another drug company. to the 10 per cent. allowed by T. D. No. 3208. Other documentary evidence, as well as oral testimony, tends to support the same conclusion. There was also oral testimony that Russell had personal knowledge of these large withdrawals by the drug company (by virtue of T. D. No. 3208); his attention having been by an employee (Mrs. Guerin) directly challenged thereto.[1]

---

[1] Paul, an assistant director at the federal prohibition office at Columbus, testified: That about December, 1921, or January, 1922, he received in the mail distributed to his desk a director's copy showing the delivery of 2,250 gallons of Hayner whisky to the Armand Com-

In connection with the assertion by Russell and Copeland of lack of knowledge, until the time above stated, of the 10 per cent. limitation in T. D. No. 3208, it was their contention that, in the absence of a specific limitation in the basic permit for the year, Regulation 60 had allowed the withdrawal in any quarter of the number of gallons found by dividing the penalty of the bond by 4.20, and that such withdrawal was not exceeded. The application for the 1921 basic permit was limited to 400 gallons, but the permit itself contained no limitation in terms. In the view we take of the case, it is unnecessary to consider the correctness of such practice and construction.

There was no direct testimony of payments by Barnett to Russell and Copeland. If the government's testimony is true, no one but plaintiffs in error would naturally be able to testify to such payment. While Russell and Copeland denied that any applications for permits were received, or permits delivered otherwise than by mail, the government's testimony is that all applications (except perhaps the first) were transmitted to the director's office by Barnett. There was no motion to direct verdict.

The only assignments of error relied upon for reversal relate to an alleged invasion by the trial court of the province of the jury

through improper comment and argument in the charge, including the reference made therein to the failure of the government to indict Ungerleider; the refusal of defendant Higgins, produced as a witness by plaintiffs in error, to answer questions on the ground of privilege; and the refusal to give the jury certain requested instructions.

1. Did the charge invade the province of the jury?

It would be impossible, in an opinion of reasonable length, to discuss each of the errors assigned relating to this proposition. The charge occupies 47 pages of the printed transcript; a substantial part being devoted to a summing up of the testimony. Thirty-two assignments of errors are directed to the aspect of the charge we are considering. [1] Broadly stated, the criticisms are that the judge expressed his opinion of, and improperly argued, the credibility of certain witnesses and the effect of certain testimony or evidence; that less prominence was given to the case made by, and the interests of, defendants than to the government's case; that the judge acted in effect as the government's advocate, and practically coerced the jury into convicting plaintiffs in error.

It is the well-settled rule in the federal courts that, in submitting the case to the jury, the judge may, in his discretion, express his opinion upon the facts, provided no general rule of law is incorrectly stated, and provided the jury is given clearly to understand that the jurors are not bound by the judge's opinion, but are left free to exercise their own judgment (Nudd v. Burrows, 91 U. S. 426, 439, 23 L. Ed. 286; Rucker v. Wheeler, 127 U. S. 85, 93, 8 S. Ct. 1142, 32 L. Ed. 102; Allis v. United States, 155 U. S. 117, 15 S. Ct. 36, 39 L. Ed. 91; Graham v. United States, 231 U. S. 474, 480;[1] Young v. Corrigan [C. C. A. 6] 210 F. 442, 127 C. C. A. 174; Sylvia v. United States [C. C. A. 6] 264 F. 593, 596; Tuckerman v. United States [C. C. A. 6] 291 F. 958, 965), and subject to the further qualification that the judge's comments be judicial and dispassionate and so carefully guarded that the jurors, who are the triers of the facts, may be left free to exercise their independent judgment; in other words, that their judgment be not coerced (Starr v. United States, 153 U. S. 614, 626, 14 S. Ct. 919, 38 L. Ed. 841; Sandals v. United States [C. C. A. 6] 213 F. 569, 130 C. C. A. 149; Wallace v. United States [C. C. A. 6] 291 F. 972; Tuckerman v. United States, supra; Roth v. United States [C. C. A. 6] 294 F. 475).

[2, 3] The right of the judge to express his

pany. That he showed this copy to Russell, saying that he (Paul) thought that was "a pretty heavy drag of whisky" and thought he would call Russell's attention to it, and believed he said that he did not think he (Russell) knew anything about it. That Russell made no comment. Also that several weeks later he had a similar experience, except that he merely called Russell's attention to the fact that it was "another one from the Hayner Distillery." This likewise was for 2,250 gallons. Also that several weeks after that he laid on Russell's desk another director's copy from the Hayner Distillery to the Armand Company. Mrs. Guerin testified, in effect, to the giving by her to an agent "from the East" (who she said came for it from Russell's office and carried it back into that office) of a list of druggists having basic permits claimed to correspond, in large measure at least, with a list later said to have been delivered by Barnett to Abe Ungerleider, and by the latter to Grossberg. Dyer, a prohibition worker under Russell, testified that on February 23, 1922, about six weeks before the close of the alleged conspiracy period, he told Russell, in the presence of one Norwood, chief of the enforcement division under Russell, that the group head at Cleveland, known to both Norwood and Russell, had told the witness he was still taking up Hayner whisky, and had evidence enough to involve Russell and Copeland, but did not believe Norwood would be involved. There was oral testimony tending substantially to show Copeland's actual connection with the conspiracy.

[1] 34 S. Ct. 148, 58 L. Ed. 319.

opinion upon the facts includes, within the limitations stated, the right to state his opinion of the credibility of witnesses, including that of the defendant himself. Tuckerman v. United States, supra at page 968; Robilio v. United States (C. C. A. 6) 291 F. 975, 986, 987. That argument and persuasion are not of themselves improper, see Nudd v. Burrows, supra at page 439;[2] Horning v. District of Columbia, 254 U. S. 135, 139, 41 S. Ct. 53, 65 L. Ed. 185;[3] Capital Traction Co. v. Hof, 174 U. S. 1, 14, 19 S. Ct. 580, 585, 43 L. Ed. 873.[4] The limitation as to argumentativeness, as stated by this court in Wallace v. United States, supra at page 973, is that the charge "must not be argumentative to a degree which makes it characteristically an act of advocacy." This, of course, means partisan advocacy. There is no impropriety in referring to and citing testimony as corroborating the judge's opin-

[2] In Nudd v. Burrows, after stating certain limitations, it is said: "Within these limitations, it is the right and duty of the court to aid them [the jurors] by recalling the testimony to their recollection, by *collating its details*, by *suggesting grounds of preference* [all italics in this opinion are ours, unless otherwise stated], where there is contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its *several parts* and their *combined effect*, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid. In such cases, chance, mistake, or caprice, may determine the result."

[3] "The judge may enlighten the understanding of the jury and thereby influence their judgment; but he may not use undue influence. He *may advise;* he *may persuade;* but he may not command or coerce." While this quotation is from the minority opinion, the words "advise" and "persuade" involve no dissent from the majority opinion.

[4] In Capital Traction Co. v. Hof, the statement of Lord Hale is cited with approval: "Another excellency of this trial [by jury] is this, that the judge is always present at the time of the evidence given in it. Herein he is able in matters of law, emerging upon the evidence, to direct them; and also, in matters of fact, to give them great light and assistance, by his *weighing the evidence* before them, and observing where the question and knot of the business lies; and by *showing them his opinion even in matter of fact*, which is a great advantage and light to laymen. * * * It has the advantage of the judge's observation, attention and assistance, in point of law by way of decision, and in point of fact by way of direction to the jury."

ion, or as corroborating the testimony of other witnesses. Such action is a proper part of a "summing up."

[4] In the instant case, full summing up by the trial judge was especially fitting. The trial lasted practically, if not fully, 8 days. Forty-nine witnesses were sworn. There were 119 paper exhibits, largely official and more or less technical. In overruling a motion for new trial, the judge said:

"Considering the nature of the case, the volume of the testimony and the fact that much of it was in documentary form, not easily handled or analyzed by the jury during the trial, it was deemed by me my duty to exercise the power vested in the trial judge to sum up the evidence, and to some extent comment thereon and express opinions. * * * There was an immense amount of atmosphere introduced into the case. This does not appear in the charge and in part only in the transcript of the testimony. Beginning with the opening statement of counsel, to their concluding arguments, able, forceful, and ingenious efforts were made to tender to the jury false issues and misleading theories. In view thereof, it was highly necessary that the pertinent evidence in the case should be summed up and brought to the jury's attention; that immaterial and misleading considerations should be laid aside, and the jury's attention directed to the true considerations to be weighed by them and upon which their verdict must rest. No more was done in this respect than was necessary. If this bore hardly upon defendants, it was because of the facts disclosed by the evidence thus summed up, and not because of any attitude of the court."

[5] The ultimate question upon this branch of the case is whether the jury was coerced into a verdict of conviction. This inquiry involves the questions whether the judge's comments were judicial and dispassionate, and the jury given clearly to understand that the jurors were not bound by the judge's opinion but were left free to exercise their own judgment. We think the record does not justify a conclusion that the jury was coerced.

(a) Early in the charge, and before direct reference to testimony, the jury was told that, in so far as the result depends upon the evidence, "It is your duty, uncontrolled by any comments I may make, to weigh the evidence and to return a verdict in accordance with that evidence and the law. Any comment of mine upon the evidence is not binding upon you. It will not absolve you from your duty to exercise your own un-

controlled judgment as to the evidence and the weight and credibility of witnesses and to return a verdict in accordance with your judgment thereon."

After full instruction upon the presumption of innocence, reasonable doubt, the weight to be given the evidence of defendants' good character, the explanation of the charge in the indictment including definition of criminal conspiracy, the review and summing up of the evidence was immediately preceded by a re-reference to the presumption of innocence and the necessity of proof beyond a reasonable doubt, with the instruction that it was the special function of the jury "to weigh the evidence and pass on the credibility of witnesses, determine what are the proven facts, what inferences may or may not be drawn from any item of testimony, and whether the evidence, taken as a whole, convinces you of the guilt of the three defendants now on trial beyond a reasonable doubt." This was followed by the statement quoted in the margin.[5]

(b) The testimony of Abe Ungerleider, Grossberg, and Gardos was important, and it was proper that it be carefully summed up.

In commenting upon Ungerleider's testimony, the court stated that, by testifying before the grand jury as a witness, he had obtained immunity from prosecution.

"Any insinuation, therefore, of impropriety or. dereliction of duty on the part of officials representing the government in this case for so proceeding in respect to Ungerlieder, should be disregarded by you."[6]

The court added:

"That is not to say, however, the fact that Abe Ungerleider did so voluntarily testify, or, in other words, to use the language of the street, did thus 'squeal' and turn state's evidence upon his associates, is not to be considered and taken into account by you in weighing the credibility to be given to his testimony, especially in so far as it may bear upon the complicity of any one of the defendants now on trial, in the alleged conspiracy. On the contrary, it is quite proper for you so to consider that set of facts."

The court further proceeded to state that Ungerleider was an accomplice, and that "the testimony of an accomplice is and always should be viewed with suspicion, carefully scrutinized and weighed, and a conviction ought not to be found upon his testimony alone, unless it is corroborated by other evidence in some material respect, in this instance by other evidence not tending to show merely the existence of a conspiracy to which he, Grossberg, Gardos, Higgins, and others were parties, but that the defendants now on trial were members of that conspiracy. The weight, however, to be given to his testimony, is within your province."

The jury was further told that, if in the court's opinion there was no evidence in the case except the testimony of Abe Ungerleider, tending to show the participation in the alleged conspiracy of the defendants on trial, he should promptly advise them to acquit the defendants, or such defendants whose conviction must rest upon the uncorroborated testimony of Abe Ungerleider, adding:

"Aside, however, from these considerations, you should weigh his testimony as you weigh the testimony of any other witness.

---

[5] "This duty must be performed by you, uncontrolled by any comments or expressions of mine, on the evidence. What I have said heretofore deals with the law of this case, and it is binding upon you. I may make some comments evidencing the impression made on my mind by the evidence or some item of it, but you are expressly commanded not to be controlled thereby, because in that respect, what I say is not the law, and it is your duty, uncontrolled by any expression of mine as to the weight or credit of any item of this evidence, to weigh it yourselves and reach your own conclusion upon your own responsibility. You will not be exonerated from weighing it by any observation that I may make."

[6] Whether or not Ungerleider gained statutory immunity by appearing before the grand jury voluntarily, perhaps without subpœna, we think that, under Judicial Code, § 269 (Comp. St. Ann. Supp. 1919, § 1246), there was no reversible error in the instruction that immunity from prosecution was gained by testifying. Independently of statute, the universal usage is that an accomplice, if called and examined by the public prosecutor on the trial of his associates in guilt, will not be prosecuted for the same offense, provided it appears that he acted in good faith and that he testified fully

and fairly. The rule is that the witness thereby obtains an equitable right to a pardon; and, while he cannot by law plead such facts in bar of an indictment against him, nor avail himself upon his trial of his equitable right to a pardon, such right will be respected to the extent of giving opportunity for such application, even by postponing the trial, if necessary, for that purpose. Whisky Cases, 99 U. S. 594, 25 L. Ed. 399; United States v. Lee, Fed. Cas. No. 15,588, 4 McLean, 103. When the charge was given, the government was asserting the truth of Ungerleider's testimony by offering it and seeking conviction of his alleged accomplices in part thereon. He had in fact not been indicted, but was omitted from the indictment (to quote its language) "because he has testified before said grand jurors under oath concerning the matters in this indictment set forth." The danger of his being indicted, and, even more, the truth of his *successful* prosecution, was negligible. The existence of immunity was, so far as the charge is concerned, important only as it might affect Ungerleider's credibility.

Apply to it the same tests, especially looking to see if his testimony, in so far as it implicates any of the other defendants upon trial, is corroborated by the testimony of other witnesses or other facts and circumstances."

After commenting upon Ungerleider's testimony of Barnett's connection with the conspiracy, the court said:

"Barnett interposes a general and detailed denial to all this testimony so far as it pertains to him, except that he does admit that both of them lived during this period at the Southern Hotel, and that he had a casual acquaintance with Ungerleider while he lived there. Barnett is the defendant. He is interested in the outcome of this trial, and his temptation to deny what is true, or to give false testimony, would seem to be as great, if not greater, than any of the other persons involved here, except that of the other two defendants on trial with him. At the same time the presumption of innocence is with him. He does not have to prove himself not guilty; he has a right to stand upon his plea of not guilty and demand that the government prove him guilty beyond a reasonable doubt by the evidence produced here. There is some evidence in his favor to which I have previously called your attention; his general reputation and character, good reputation and good character, for honesty and integrity. His testimony, notwithstanding his interest and the probable temptation that he is under to deny all incriminating circumstances or to give false testimony in his own behalf, should, however, be duly weighed and considered by you and be given such weight and credit as under all the facts and circumstances of the case it is entitled to."

Immediately following this instruction, attention was called to certain testimony of Grossberg as supporting the testimony of Ungerleider "in so far as it involves Barnett," including reference to Grossberg's testimony as tending to show that Ungerleider handed to Barnett six permits (applications). This comment was made by the court:

"Grossberg does not claim that he saw the actual transfer of the permits from Abe to Barnett; but, if you believe Grossberg's testimony, the inference, the reasonable inference, is that the last six were so delivered, because they later turned up in the office of the prohibition director, and the vendee's permits forms 1410–A were issued thereon."

And, after further discussion of the testimony thought to corroborate the testimony of Ungerleider, the court said:

"If Grossberg is to be believed, with his

12 F.(2d)—44

testimony thus supporting Abe's, it must follow that Barnett was a full member of the conspiracy.[7] You saw Grossberg and you heard him testify. He also is an accomplice, and the charge which I gave you pertaining to the care and scrutiny which you should exercise in weighing the testimony of an accomplice applies equally to him."

After stating that the jury should consider for what it is worth Grossberg's relations of friendship and otherwise to Sam Ungerleider, and Sam's relations and connection, if any, with these transactions in a criminal or improper way, as well as all the other circumstances of contradiction or inconsistency tending to impeach Grossberg's testimony or to discredit his memory or to weaken the weight of it, and, on the other hand, the fact that, having fled the country in May, 1922, he resisted extradition, and was sent back by the order of the Canadian courts, and that, before entering a plea of guilty he was interrogated and answered that no promise or inducement had been held out to him to enter his plea, or any promise of leniency or favorable treatment, the court added:

"Even so, you must still bear in mind that he is an accomplice, and we cannot know what secret hopes of favor he may have indulged, notwithstanding these facts. You have heard his testimony, and you are the judges and the sole judges of the weight and credit to be given to his testimony."

Almost immediately following this statement it was said that Grossberg's testimony corroborates (as it in fact did) that of Ungerleider in certain respects, and that Grossberg's testimony was left, along with that of Abe Ungerleider, "to be weighed for what in your sound judgment it may be worth," adding:

"But in my opinion, not controlling upon you, I believe Grossberg to be a credible witness, entitled to a fair measure of credit in this case. If you do not; if your view is otherwise, you will understand that observation is not binding upon you, and does not relieve you from your responsibility of weighing his testimony upon your own oaths."

[6, 7] Reference to motives of witnesses for testifying one way or the other was proper. Tuckerman v. United States, supra at pages 964, 965. It cannot be said that in any of these comments by the trial judge the facts were misstated or misleading theories advanced; nor can it be said that the jury

---

[7] Such a conclusion would inevitably follow.

could well have failed to understand that the court's expressions were advisory only. The expression of opinion of Grossberg's credibility was, in our opinion, not improper.

In commenting upon the testimony of Dyer, hereinbefore referred to, the court said:

"Norwood is not called as a witness, nor is his absence accounted for. The inference on that, all inferences as to this testimony, the truth of it, what did take place, are all to be left with you."

[8] The criticism upon this reference to failure to call Norwood is not well founded. Young v. Corrigan (C. C. A. 6) 210 F. 442, 127 C. C. A. 174, affirming (D. C.) 208 F. 431.

With reference to defendants Russell and Copeland, after stating that defendants claimed to have issued all the permits in question in good faith, relying upon an honest belief that the bond given by the drug company under Regulation 60 justified or authorized, "nothing else appearing to the contrary," such withdrawals in the amount made by the drug company, and after referring to the testimony of other witnesses called by the defendants in corroboration of the defendants' claims of good faith, and of the claims of Russell and Copeland of their unfamiliarity, until May, 1922, or later, with T. D. No. 3208 and the 10 per cent. limitation therein contained, and the requirement of the report showing the amount of other business done during the preceding quarter, the court remarked:

"Frankly * * * and for reasons which I shall state more in detail later, I have difficulty in believing the good faith of these denials and these assertions; but you will understand that that expression of my opinion is not controlling upon you, and you must find, make up your own mind, and follow it on that subject so far as it is necessary in reaching a conclusion on it by you."

And, after referring to certain evidence relied upon by the government in corroboration of Grossberg and Abe Ungerleider, so far as it involved Russell, Barnett, and Copeland in the alleged conspiracy, including the testimony of Grossberg and Ungerleider of Barnett's procuring a prompt issue of Gardos' held-up application for alcohol permit, the court said:

"Is the explanation of why the alcohol permit was held up and released, suggested by the testimony of Abe Ungerleider and Grossberg? And is that explanation as suggested by them the reasonable one to make,

or is it an unreasonable inference to make under the circumstances?"

And, after further commenting upon the testimony of Grossberg and Ungerleider with reference to Barnett's connection with the held-up alcohol permit, stated:

"Now, gentlemen of the jury, weigh that set of circumstances; is it a mere coincidence, a mere matter of chance, that the held-up permit came through so opportunely, or did it come through so opportunely because some one pushed a button in the office of the prohibition director? And, if some one pushed a button in the office of the prohibition director, who pushed it? These are inquiries that I want you to consider and weigh. Answer them in accordance with your own understanding of this testimony. If you believe from the evidence that the issue of form 1410–A on the held-up alcohol permit was not a mere matter of chance but was the result of somebody's opportune intervention, is or is it not difficult to escape the conclusion that Warren Barnett was an active instrument in bringing about that result, or that there was some access, either through the front door or through the back door to the office of the prohibition director?"

Immediately preceding the paragraph just quoted, the court said:

"It was this demonstration of somebody's ability to procure prompt issue of permits for withdrawals that induced Gardos to make himself a party to the conspiracy."

Defendants' counsel treat this last remark, "it was this demonstration," etc., as the personal allegation of the judge. While apparently the correctness of this construction is not of great importance, it seems to us the more natural construction that it was merely a part of the statement of the gist of the testimony of Grossberg, which the court had been just before referring to.[8]

In discussing the documentary evidence "relied upon by the government to show direct participation by Russell and Copeland in the conspiracy," and after referring to their denial of any participation therein, and of the presumption of innocence, as more fully quoted in the margin hereof,[9] and aft-

---

[8] Grossberg had testified, in substance, and by natural implication, that he secured Gardos' co-operation in the conspiracy by convincing him (through the expediting of the alcohol permit, not otherwise connected with the conspiracy charged here) that Grossberg's "connections were all right."

[9] "I have already said that Copeland and Russell deny generally and explicitly all knowl-

er explaining the meaning and requirements of T. D. No. 3208, the court said:

"You may content yourselves with an inquiry whether or not they [Russell and Copeland] knew of 3208; whether they knew of the requirements to file 52–A and 52–B, whether they knew that 10 per cent. of the drug sales was the amount controlling the withdrawals of the Armand Drug & Candy Company. For, if that were the case, there is no contention here in their testimony, and no claim made, that their conduct was in accordance with any interpretation which they put or were justified in putting, rightly or wrongly, upon 3208. On the contrary, their contention is that their conduct was justified by the practice which 3208 undertook to supersede."

The court then said:

"Is it unjust to say of this assumed state of ignorance or want of knowledge that it is hard to credit? Credit it if you can, if you believe it is entitled to credit; but I put it to you to consider, is not this assumed state of want of knowledge or ignorance on the part of Russell and Copeland of a fundamental regulation proclaimed for the administration of their office, exceedingly difficult to credit?"

Then, after some reference to the experience and official service of defendants Russell and Copeland, the further qualification was given as stated in the margin.[10]

After further detailed discussion of the documentary evidence in connection with the failures of Russell and Copeland to take action to stop the drug company's withdrawals, the court said:

"Now there you have Mr. Russell's predicament. There you have the documentary evidence, made in his office, and made by himself. The latest letter to Major Haynes is February 8th. He is shown to have this knowledge in October; he ought to have had it as soon as he went into office, and the flow of whisky continued uninterrupted, until John A. Harper, working out of the office of Divisional Chief Melan, not working under Russell or under his chief enforcement agent, Norwood, put a stop to it. It did not take Harper long to put a stop to it."

In commenting upon the testimony of Mrs. Guerin regarding the furnishing of list of druggists, the court made the statement quoted in the margin.[11]

In his opinion denying motion for new trial, the judge made the statement quoted in the margin.[12]

edge of the alleged conspiracy and deny any participation therein, directly or indirectly. They are presumed to be innocent. They do not have to prove themselves not guilty. They have a right to stand upon their pleas, and challenge the government to bring evidence here of their guilt beyond a reasonable doubt. Hence it is that I am not undertaking to make any references to the special temptation that they or either of them may be under to tell that which is not true if they think it will help them. I am repeating their testimony, to be dealt with on the same basis as the testimony of any other witness in the case."

[10] "However * * * these two defendants are not on trial here for neglect of duty or failure to observe regulations and instructions. They are not on trial for ignorance or incompetency or inefficiency in office. They are on trial for having made themselves parties to a conspiracy to withdraw intoxicating liquors to be diverted, sold, transported, and possessed for beverage purposes, and for defrauding the government out of the higher tax imposed on beverage liquor. That they signed and issued permits knowingly and intentionally is not a disputed fact. The fact in dispute is, Were they then members of the conspiracy? Or, in other words, did they knowingly and intentionally, not merely negligently, issue or cause these permits to

be issued in aiding, abetting, and assisting the conspirators to get this liquor withdrawn for an illegal use? And, if they were, whether by nonaction, if they corruptly and willfully refrained from acting, having knowledge of the conspiracy that was in progress, it is no excuse or defense to say that 'we did not personally profit by it.' So * * * your inquiry must be whether or not they made themselves party to a corrupt conspiracy and aided or abetted or assisted in it, either by affirmative action or by the failure to act and perform their duties. They are not to be found guilty because of mere neglect of duty, inefficiency, or incompetency."

[11] If Mrs. Guerin on the one hand, or Abe Ungerleider or Grossberg on the other, are mistaken, or are not mistaken, but are fabricating, is the right term, that item of evidence, where and when and under what circumstances does it appear that Mrs. Guerin and Abe Ungerleider and Harry Grossberg could have gotten together for the purpose of matching up their story? I leave these considerations with you, gentlemen, to say if you find the episode to be true from this testimony. And I put the inquiry to you, and I leave it to you to answer, if in large part, the chain of evidence does not link together and hang from that list as from a hook."

[12] "An examination of the documentary evidence made by defendants Russell and Copeland is, as to them, tantamount to a plea of guilty. I deem it unnecessary to review that documentary evidence, but in the light thereof these two defendants appear to have been knowingly and intentionally aiding, abetting, and assisting in the illegal conspiracy, and not merely negligent, indifferent, or insubordinate in failing to observe instructions repeatedly brought to their

Just before the final paragraph of the charge, the jury was again cautioned in full, and explicit language, which we quote in the margin;[13] that they were not to be controlled by the court's expression of opinion upon the facts, but that the responsibility rested upon them.

[9.] Each case must be judged by its own facts and circumstances. Considering these several comments of the court in their entirety and in their respective contexts, in connection with the testimony in the record and

---

attention and observance of which would have nipped this conspiracy in the bud." Also in the same opinion Judge Westenhaver said: "During nearly nine years of service on the bench, I have not heard in any criminal case more clear and convincing evidence of guilt." We cannot pronounce these statements extravagant.

[13] "In so far as I have commented upon the weight of any item of evidence, or the credit to be given to the testimony of any witness, in so far as you may have imbibed from my comment on this evidence, if you have so imbibed, an impression that I entertain an individual and personal opinion as to what your verdict should be, I beg of you not to permit this to be controlling. In the domain of weighing testimony, and passing upon the credibility of witnesses, finding what the truth is from conflicting testimony, and reaching a conclusion as to the guilt or innocence of the defendants upon trial, no one has any right to impose their judgment or opinion upon you. And for that reason I am again warning you that, if I have made any comments from which you imbibed the opinion that I entertain a particular opinion, I want you to understand that you must judge this case yourself. Any comment of mine upon the facts is not an expression that you are obliged to follow. Any comment of mine as to the weight or credit of a witness or an item of evidence does not excuse you from exercising your own independent judgment thereon, and I hope you will do so. And having done so, no one will have any right to criticize you or call you to any account. * * * No one should be convicted by a jury until that jury, after a fair, candid, and impartial scrutiny of the testimony, has reached a conclusion therefrom under the law as I give it to you, that the defendant is guilty beyond a reasonable doubt. But, having reached that conclusion, if you do so, then the interest of the public intervenes and it is important, of the utmost importance, that the law should be vindicated, and that offenders against the majesty of the law should be made to answer for their crimes. In the performance of that duty there is no place for prejudice, passion, or sympathy. You should go forward to your duty, as it were with a bandage over your eyes so far as persons are concerned. So that you will see nothing except the law, the evidence, and your duty, and I am confident you will approach the consideration of this case in that frame of mind."

the judge's statements heretofore cited made in denying motion for new trial, we are not impressed that reversible error has thereby been committed. While many of the comments are argumentative, within appropriate limits, as has already been said, argumentativeness is not a fault. Nor do we find that the court in any of its comments misstated evidence or put forward false theories. We cannot assume that the trial judge, by an unjudicial manner and by emphasis upon certain words, gave a coercive effect to expressions otherwise, and on their face proper.

[10] We have not referred to every criticized feature of the charge, but we have aimed to mention features fully as important and as extreme as any that are criticized. Nor do we think the charge criticizable as giving less prominence to defendants' side than to that of the government. Aside from the testimony of the three plaintiffs in error and the character witnesses, defendants presented comparatively little testimony. We think due prominence was given to defendants' contentions upon the effect of presumption of innocence, reasonable doubt, and good character as repudiating a charge of crime. At the close of the charge the court's inquiry whether counsel for defendants requested any further or additional charge elicited a negative answer.

Expressions of opinion and argument by the trial court fully as extreme as any present here have heretofore passed the scrutiny of this court or of the Supreme Court. And, so far as we have observed, each of the cases in this court and in the Supreme Court, in which the charge has been held to amount to coercing a verdict for the government, has presented a feature or features which we think not found here.

[11] 2. We think no error was committed in refusing defendants' requests to charge. The subject-matter of all except the seventh and eighth requests was, we think, sufficiently covered by the charge of the court upon its own motion. The seventh request related to the construction of Regulation 60, which the court held, and we think rightly, was, in the respect now important, superseded by T. D. No. 3208. The same is, in substance, true of request No. 8.

3. Complaint is made that defendant Higgins, called as a witness for plaintiffs in error, was permitted to refuse to state an alleged conversation between himself, Grossberg, and the two Ungerleiders, upon

the assertion of the witness that his answer would tend to incriminate him. The avowal was that the witness, if compelled to answer, would testify that in (perhaps about) November, 1921, he discussed with Grossberg, Abe Ungerleider, and Sam Ungerleider the purchasing by the witness from these three persons, as partners, of liquor for beverage purposes in violation of the Prohibition Act. The same ruling was extended to further questions which it was claimed, if permitted, would elicit testimony of payments by Higgins to Sam Ungerleider in November, 1921, and May, 1922, as well as a payment in or about November, 1921, to the same person of about $52,000 for the Hayner whisky involved in the alleged conspiracy.

The suggested competency of this proposed testimony is that it would have tended to discredit Abe Ungerleider and Grossberg as witnesses for the government, in that they had claimed that Sam Ungerleider was not a partner of Abe Ungerleider and Grossberg, and not a party to the conspiracy.

[12-14] The question of the guilt or innocence of Sam Ungerleider was not an issue in the case. Proof of his connection with the conspiracy would not have helped the case of plaintiffs in error upon the merits. It was collateral thereto. But assuming, for the purpose only of this opinion, that the proposed testimony was competent, and had substantial relevancy, we think there was no error in respect of the witness' claim of incriminating tendency. The judge, who saw the witness and who had heard the government's testimony, including that of Grossberg and Abe Ungerleider, believed the claim of incriminating tendency was made in good faith, and that the witness was entitled to assert the privilege. In the absence of manifest error, this ruling should not be reversed. Mason v. United States, 244 U. S. 362, 366, 37 S. Ct. 621, 61 L. Ed. 1198; Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110. It is not clear that the statute of limitations had necessarily run against prosecution of the witness for violations of the Prohibition Act not covered by the plea of guilty of the conspiracy charged, or of possible violations of the Internal Revenue Act. The witness was not required to show how the incrimination might occur. To do so might make the privilege valueless. The court's action was within the permitted exercise of sound discretion.

It results from these views that the judgment of the District Court should be affirmed.